## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## DOCKET NO. 1:24-CV-41

-------------------------------------------------------X

**JACOB DOE**

                    **Plaintiff,**

    **v.**

**THE UNIVERSITY OF NORTH
CAROLINA SYSTEM, THE UNIVERSITY
OF NORTH CAROLINA AT CHAPEL
HILL, THE UNIVERSITY OF NORTH
CAROLINA BOARD OF GOVERNORS,
BOARD OF TRUSTEES OF THE
UNIVERSITY OF NORTH CAROLINA AT
CHAPEL HILL, KEVIN GUSKIEWICZ, in
his official capacity, ELIZABETH HALL,
individually and in her official capacity,
JACLYN FEENEY, individually and in her
official capacity, BETH FROEHLING,
individually and in her official capacity,
JEREMY ENLOW, individually and in his
official capacity, JOHN KASPRZAK,
individually and in his official capacity, and
KARLINA MATTHEWS, individually and in
her official capacity.**

                    **Defendants.**

-------------------------------------------------------X

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Jacob Doe (hereinafter referred to as "Plaintiff" or "Doe")[1], by and

through his counsel, Ekstrand and Ekstrand, LLP, as and for his complaint against

---

[1] Contemporaneously with this complaint, Plaintiff is filing a motion permitting Plaintiff to
proceed pseudonymously in this action.

1

defendants the University of North Carolina System, the University of North Carolina at Chapel Hill, the University of North Carolina Board of Governors, the Board of Trustees of the University of North Carolina at Chapel Hill, Kevin Guskiewicz (collectively, the "University" or "Defendants"); and Elizabeth Hall, Jaclyn Feeney, Beth Froehling, Jeremy Enlow, John Kasprzak, and Karlina Matthews (collectively, the "Individual Defendants") alleges upon knowledge with respect to himself, and upon knowledge, information and belief as to all other matters, as follows:

## THE NATURE OF THIS ACTION

1.    Plaintiff was an undergraduate student at the University of North Carolina at Chapel Hill ("UNC" or the "University") when he became the subject of a fabricated allegation of sexual misconduct designed to destroy his reputation, his education, his future educational and professional prospects, and his connections to the UNC community.

2.    In April of 2023, a female student (referred to herein as "Jane Roe" or "Roe") initiated a formal Title IX complaint falsely accusing Plaintiff of sexual exploitation and sexual misconduct arising out of her consensual sexual interaction with Plaintiff in the late evening of August 31, 2022, or the early morning hours of September 1, 2022.

3. As a result of Roe's false accusations against him, Plaintiff has been shunned and cancelled by most, if not all, of his friends and peers at UNC, his reputation has been permanently destroyed, his scholarship awarded by the Thurgood Marshall College Fund will be revoked, he will lose summer employment his sophomore and junior years and employment upon graduation with a Fortune 150 company, and, most critically, he has been suspended from the entire University of North Carolina System and trespassed from all of its property, with only a possibility of reinstatement beginning the fall 2025 semester.

4. Plaintiff was wrongly found responsible and has suffered immense, compounding mental anguish and irreparable harm and will continue to do so for his entire career unless the relief he seeks from the court in this action is granted.

5. The University permitted Roe to weaponize UNC's Title IX process against Plaintiff when the Investigators, the Equal Opportunity and Compliance Office, the hearing officer, and the appeal officer not only failed to ensure that the investigatory and adjudicatory processes were fair and objective, but rather contributed to the defective, prejudicial, and arbitrarily inequitable processes that were replete with gender bias against Plaintiff.

6. As a result, Plaintiff was suspended from UNC and is barred from reapplying to UNC or to any constituent institution in the UNC System until at least the fall of 2025, derailing his educational goals and career aspirations,

causing him to forfeit his scholarship and employment, permanently tarnishing his name and reputation.

7.     Based on the foregoing, Plaintiff brings this action for violations of 42 U.S.C. § 1983 (Denial of Fourteenth Amendment Procedural Due Process), violations of Title IX of the Education Amendments of 1972, breach of contract, and other state law claims.

## THE PARTIES

8.     At all times relevant to this Complaint, Plaintiff was and is a natural person and citizen of the United States who resides in the State of North Carolina.

9.     At all times relevant to this Complaint, Defendant the University of North Carolina System (hereinafter the "UNC System") was and is a body politic and corporation capable of being sued pursuant to N.C.G.S. § 116-3 for the actions of its constituent institutions.   By statutory directive, the UNC System is "responsible for the general determination, control, supervision, management and governance of all affairs of the constituent institutions" (*Id*. § 116-11(2)) including, but not limited to, the University of North Carolina at Chapel Hill, East Carolina University, Elizabeth City State University, the University of North Carolina at Charlotte, the University of North Carolina at Asheville, the University of North Carolina at Wilmington, Western Carolina University and Appalachian State University.  N.C. Gen. Stat. § 116-2(4).

10.    At all times relevant to this Complaint, Defendant the University of North Carolina at Chapel Hill (the "University" or "UNC") was and is a public research university operated by the State of North Carolina and is a part of the UNC System and network of facilities of higher education with its principal place of business in Chapel Hill, Orange County, North Carolina.  As such, the University is a "constituent institution" of the UNC System.  N.C. Gen. Stat. § 116-2(4).

11.    At all relevant times, the Board of Governors of the University of North Carolina has been and is the corporate entity of the University "capable in law to sue and be sued" under N.C. Gen. Stat. § 116-3.

12.    At all relevant times, the University of North Carolina Board of Governors, composed of eight individuals elected by the UNC Board of Governors, four individuals appointed by the North Carolina General Assembly, and the president of the student government, was and is tasked with serving as an advisor to the Board of Governors on matters pertaining to its institution and as advisor to the Chancellor concerning the management and development of the institution.

13.    Upon information and belief, at all times relevant to this Complaint, UNC and the UNC System receives and continues to receive federal funding and is

therefore subject to liability under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (hereinafter "Title IX").

14.     At all relevant times, Defendant Kevin Guskiewicz ("Defendant Guskiewicz") was and is the Chancellor of the University of North Carolina at Chapel Hill.

15.     At all relevant times to the investigation and proceedings against Plaintiff, Defendant Elizabeth Hall ("Defendant Hall" or "Ms. Hall") was the Associate Vice Chancellor of the EOC and the Title IX Coordinator for UNC.

16.     At all relevant times, Defendant Jaclyn Feeney ("Defendant Feeney" or "Ms. Feeney") was and is a Title IX investigator for the University, tasked with investigating reports of sexual assault, interpersonal violence, stalking, complicity, retaliation, and protected class discrimination and harassment.  Ms. Feeney served as the lead investigator of the allegations in Roe's complaint against Plaintiff.

17.     At all relevant times, Defendant Beth Froehling ("Defendant Froehling" or "Ms. Froehling") was and is a Title IX investigator for the University, tasked with investigating reports of sexual assault, interpersonal violence, stalking, complicity, retaliation, and protected class discrimination and harassment.

18.     At all relevant times, Defendant Jeremy Enlow ("Defendant Enlow" or "Mr. Enlow") was and is a Title IX investigator for the University, tasked with

investigating reports of, among other things, sexual assault, interpersonal violence, stalking, complicity, retaliation, and protected class discrimination and harassment. Defendant Enlow was appointed by Defendant Hall to investigate the issues and allegations raised in Plaintiff's counter-complaint against Roe.

19.     At all relevant times, Defendant John Kasprzak ("Defendant Kasprzak" or "Mr. Kasprzak") was the Hearing Officer for the University, tasked with adjudicating the complaint against Plaintiff and ensuring that those proceedings complied with state and federal laws.

20.     At all relevant times, Defendant Karlina Matthews ("Defendant Matthews" or "Ms. Matthews") was and is a Title IX Appeal Officer for the University, tasked with adjudicating appeals from the decisions of Hearing Officers in adjudications of reports of sexual assault, interpersonal violence, stalking, complicity, retaliation, and protected class discrimination and harassment.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1367.

22.     This Court has personal jurisdiction over the UNC System, the University, the University of North Carolina Board of Governors, and the Board of Trustees of the University of North Carolina at Chapel Hill on the ground that the

7

UNC System is conducting business within the State of North Carolina, including in this judicial district.

23.     This Court has personal jurisdiction over the Individual Defendants as they all reside in the State of North Carolina and/or their wrongful and unlawful actions, individually and collectively, took place in the state of North Carolina.

24.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the Defendant UNC System was and is a body politic and corporation capable of being sued pursuant to N.C. Gen. Stat. § 116-3 for the actions of its constituent institutions, including those which are located within this judicial district. All constituents of the University of North Carolina System are implicated in Plaintiff's suspension, as he has been removed from, prohibited from entering the property of, and prohibited from applying to, any university within the University of North Carolina System including those within this judicial district.


## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.      *Plaintiff's Scholarship and Enrollment at UNC*

25.     Plaintiff matriculated as a freshman student at the University in August of 2022 with a four-year partial scholarship that would continue so long as Plaintiff is enrolled as an undergraduate degree-seeking student at the University, which he has done.

26.     The University charges Plaintiff for tuition, room and board roughly $52,000.00 (Fifty-Two Thousand Dollars) per year.

27.     Plaintiff entered into a valid contract with Thurgood Marshall College Fund and Visa© ("Visa"), third-party entities that are distinct and separate from the University.

28.     Under Plaintiff's contract with TMCF, Visa pays the University directly $10,000.00 per semester for Plaintiff's undergraduate education which, to date, totals $30,000.00 (Thirty Thousand Dollars) in tuition paid to the University for Plaintiff's education, and, but for Defendants' actions, would have provided Plaintiff with employment his summer sophomore year (2024), summer junior year (2025) and employment upon graduation 2026.

29.     Among other things, Plaintiff's scholarship agreement provides in relevant part:

> Student agrees to forfeit and return or, as applicable, repay to TMCF the full amount of the Scholarship, at TMCF's discretion, within thirty (30) days if there is a change in Student's status (e.g., a leave of absence, a withdrawal, suspension, dismissal or other separation from Institution). Student's obligation of repayment shall apply to any and all Scholarship funds disbursed to the institution on Student's behalf during the semester in which the said change of status occurs.

9

30. During his first three semesters of enrollment at UNC, Plaintiff met all of the University's and TMCF's academic and financial requirements.

31. But for the events alleged herein, Plaintiff would be a student in good standing advancing towards his degree.

## II. *Relevant Policies and Procedures*

32. During the relevant timeframe, UNC employed different conduct policies depending upon the location of the alleged incident.

33. The Policy on Prohibited Sexual Harassment Under Title IX ("Title IX Policy") applied to reports of Title IX Sexual Harassment alleged to have taken place at "locations, events, or circumstances for which the University exercised substantial control over both the Responding Party and the context in which the Title IX Sexual Harassment occurred at the time of the alleged incident."

34. For alleged instances of sexual harassment or assault falling outside the definitions and/or jurisdictional requirements set forth by the Title IX Policy, the University would employ the Policy on Prohibited Discrimination, Harassment and Related Misconduct Including Sexual and Gender-Based Harassment, Sexual Violence, Interpersonal Violence, and Stalking ("PPDHRM") and the accompanying procedures.

35. The PPDHRM applies to prohibited conduct that occurs on and off campus, including online or electronic conduct, if "the conduct occurred in the context of an employment or education program or activity of the University, had continuing adverse effects on campus, or had continuing adverse effects in an off-campus employment or education program or activity of the University."

36. Both the Title IX Policy and the PPDHRM assure that the University will "provide for the prompt and equitable" response to reports, however the specific procedures applicable to each policy differ in some respects, as described below.

### A. __The Policy on Prohibited Sexual Harassment Under Title IX__

37. Under the Title IX Policy, upon receipt of a report of Sexual Harassment, the Title IX Coordinator or designee must promptly contact the Reporting Party to discuss supportive measures, determine the party's wishes with respect to supportive measures, inform the reporting party of the availability of supportive measures regardless of whether a formal complaint is filed, and explain the process for filing a formal complaint.

38. The Title IX Coordinator or designee will also, where appropriate, refer the matter to the Emergency Evaluation and Action Committee ("EEAC") to assess whether the Responding Party poses a danger to themselves, or other members of the University community, or to University property.

39.     Prior to any required notice to the responding party, if the EEAC determines that any of these conditions exist, they may impose a number of measures, alone or in combination, pending the conclusion of the resolution process.

40.     Specifically, the EEAC "may impose on a student Responding Party an emergency removal, which may be referred to as a 'summary suspension,' if the EEAC finds an immediate threat to the physical health or safety of any individual arising from the allegations of Sexual Harassment that justifies removal."

41.     The University did not invoke the EEAC procedures against Plaintiff in this matter.

42.     The resolution process begins with the filing of a formal complaint with the Title IX Coordinator or her designee.

43.     A formal complaint may be dismissed during the resolution process if the conduct reported in the formal complaint:  (i) would not constitute sexual harassment under Title IX; (ii) did not occur in a university educational program or activity; or (iii) was not directed against a person located in the United States.

44.     A Formal Complaint may also be dismissed, in whole or in part, in the Title IX Coordinator's discretion, if:  (i) a Reporting Party notifies the Title IX Coordinator or designee, in writing, that the Reporting Party would like to withdraw the Formal Complaint, in whole or in part; (ii) the Responding Party is

12

no longer enrolled in or employed by the University; or (iii) specific circumstances prevent the University from gathering evidence sufficient to reach a determination about the Formal Complaint.

45.    The Title IX Coordinator or designee also will review the reported conduct to determine whether investigation or other resolution of the complaint should proceed under the PPDHRM Policy.

46.    After dismissing a formal complaint, the Title IX Coordinator or designee will send written notice of the dismissal and the reason(s) for dismissal simultaneously to the parties within five (5) business days.

47.    Either party may appeal the dismissal of a formal complaint within five (5) days on the following grounds: procedural irregularity; new evidence; or a conflict of interest or bias.

48.    Should the matter move forward, the University commits to conducting a prompt, thorough, and impartial resolution process.

49.    Informal resolutions may be facilitated by the University to resolve a formal complaint at any time prior to reaching a determination on responsibility. Both parties must voluntarily consent to the informal resolution process in writing in order for it to proceed.

50.    The Policy notes that in all phases of the formal resolution process, the parties will be provided an equal opportunity to present fact and expert

witnesses, inculpatory and exculpatory evidence, and to have an advocate of their choice at any meeting.

51.     Anyone invited to participate in any interview, hearing, or meeting must be provided written notice of the date, time, location, participants, and purpose of the meeting with sufficient advance time to prepare.

52.     The Responding Party is to be presumed not responsible for the reported conduct at all times during the process, until a determination regarding responsibility is made at the conclusion of the formal process.

53.     The Policy also specifies that the burden of proof and burden of gathering evidence sufficient to reach a determination of responsibility rest on the University and not on the parties.

54.     The University is to provide written notice of the investigation to the parties within five (5) business days of receipt and review of a formal complaint, confirmation from the Reporting Party of the intent to proceed with an investigation and/or sufficient information for the University to determine whether the complaint meets the jurisdictional requirements.

55.     The written notice of investigation is to include the following information:  (i) notice of the University's process for resolving reports of Title IX Sexual Harassment, including any available informal resolution processes; (ii) notice of the allegations of Sexual Harassment, including, if known, the identities

14

of the parties involved in the incident, a summary of the conduct reportedly constituting Sexual Harassment; and the date and location of the reported incident; (iii) information about the range of potential sanctions under the Title IX Sexual Harassment Policy, including, where appropriate, notification that expulsion is a possible sanction for a student Responding Party and that expulsion precludes matriculation at any University of North Carolina constituent institution; and (iv) information about the parties' rights and responsibilities, including that the Responding Party is presumed not responsible for the reported conduct, the parties may have an Advocate of their choice, the parties may inspect and review evidence obtained as part of the investigation that is directly related to the allegations contained in the Formal Complaint, and a notification that it is a violation of the University's PPDHRM Policy and Honor Code to knowingly make false statements or knowingly submit false information during the resolution process.

56. The Title IX Coordinator will assign investigator(s) who have appropriate training and experience investigating allegations of sexual harassment. The investigator(s) are to gather information regarding the alleged conduct and will prepare an investigative report summarizing the evidence obtained as part of the investigation that is relevant to the allegations raised.

57. Before the investigation report is completed, all parties must be given an equal opportunity to inspect and review any evidence obtained as part of the

investigation that is directly related to the allegations, including evidence on which the University does not intend to rely in reaching a determination, as well as inculpatory and exculpatory evidence, so that each party may meaningfully respond to the evidence prior to conclusion of the investigation.

58.     After review of the evidence, the parties may submit a response in writing within ten (10) business days.

59.     Once the written responses are received, or the ten (10) business day response period lapses, the investigator(s) will consider any written responses and create a final investigation report summarizing all the evidence.

60.     After the investigation reports have been reviewed and responded to, the investigators will provide the report to a Hearing Officer.

61.     The final report must be sent to each party at least ten (10) business days prior to a hearing.

62.     The University designates a Hearing Officer who must have sufficient training to serve in this capacity.

63.     Both parties have the ability to challenge a Hearing Officer on the basis of an actual conflict of interest, bias, or lack of impartiality, and any Hearing Officer may decline to participate on the basis of an actual conflict of interest, bias, or lack of impartiality.

64.     Prior to the hearing, the Hearing Officer will meet separately with each party and their advocate to resolve pre-hearing concerns.  At the pre-hearing meeting, the parties will have an opportunity to raise any challenges to the composition of the Hearing Officer and ask questions about the hearing process. Procedural challenges must be raised at least fifteen (15) business days prior to the hearing.

65.     The hearing is conducted by the Hearing Officer.

66.     During the live hearing, both parties will have the opportunity to provide a statement of their account related to the alleged conduct, to present any evidence including witnesses, and, through their advocate, may pose cross-examination questions to any individual participating in the hearing.

67.     Each party's advocate is permitted to ask the other party and any participating witnesses all relevant questions and follow up questions, including those challenging credibility.

68.     The cross-examination is to be conducted directly, orally, and in real time by the party's advocate or advisor and never by a party themselves.

69.     Before a participant answers any question, the Hearing Officer first determine whether the question is relevant and will explain any decision to exclude a question as not relevant.

70.     Challenges to a relevance determination may not be raised during the hearing but may be raised on an appeal.

71.     While questions and evidence concerning a complainant's sexual predisposition or prior sexual behavior are generally deemed not relevant, such evidence can be offered when it concerns specific incidents of prior sexual behavior between the parties and is offered to prove consent.

72.     The Hearing Officer may not draw an adverse inference about responsibility based on a party or witnesses' absence from the hearing or refusal to answer cross-examination questions.

73.     After the hearing, the Hearing Officer will make a final determination regarding responsibility using the preponderance of the evidence standard.  The determination should be made based upon an objective evaluation of all relevant evidence, both inculpatory and exculpatory.

74.     The Hearing Officer will then issue a written determination that includes:  (i) identification of the reported conduct potentially constituting Sexual Harassment; (ii) a description of the procedural steps taken from receipt of the formal complaint through the determination, including any notices to the parties, interviews with the parties and witnesses, site visits, methods used to gather other evidence, and hearing(s) held; (iii) findings of fact supporting the determination; (iv) conclusions regarding the application of the University's Title IX Sexual

18

Harassment Policy to the facts; (v) a statement of and rationale for the result as to each instance of reported conduct, including a determination regarding responsibility, any disciplinary sanctions imposed on the Responding Party; (vi) whether remedies will be provided to the Reporting Party; and (vii) the University's procedures and permissible bases for the parties to appeal, including the time frame for submitting an appeal and the name of the Appeals Officer who will be assigned to review any appeal filed.

75.     The decision is to be provided to both parties simultaneously.

76.     Either party may submit an appeal based on: (i) procedural irregularity; (ii) new evidence; and/or (iii) conflict of interest or bias.

77.     Appeals must be submitted in writing to the Report and Response Coordinator within five (5) business days of the determination.

78.     Upon receipt of the appeal, the Title IX Coordinator will forward the appeal to the Appeals Officer, who is to be an impartial decision-maker who is sufficiently trained to serve in that capacity.

79.     If the appeal meets the required criteria, the other party is permitted an opportunity to review the written appeal and respond to it in writing.

80.     Generally, the scope of the appeal is limited to a review of the written documentation or record of the original hearing and pertinent documentation regarding the grounds for appeal.

19

81.     The Appeals Officer may affirm the outcome, return the matter to the Hearing Officer with instructions to reconvene to cure a procedural error or to assess the weight and impact of newly discovered evidence, or where the procedural error cannot be cured by returning the matter to the original Hearing Officer, convene a hearing before a newly constituted Hearing Officer.

82.     A written decision is to be issued within fifteen (15) business days from the date of submission of all appeal documents.

83.     The Appeal Officer's decisions are final except in cases involving expulsion, which allow for further appeal based on specific grounds.

84.     Sanctions are intended to address the effects of the misconduct on the Reporting Party and the University, hold the Responding Party accountable for the conduct, and eliminate sexual harassment, prevent its recurrence, and remedy its effects.

85.     The suspension of a student means that a student is removed from the University and from the UNC System, and may not be readmitted to the University or admitted to any other UNC System university until at least the end of the period of suspension.

86.     The University will not accept academic credits for any courses completed at other institutions during the period of suspension.

Case 1:24-cv-00041-WO-LPA   Document 1   Filed 01/17/24   Page 20 of 133

87. The Policy provides that the Title IX Coordinator, investigator(s), the Hearing Officer, the Appeal Officer, and any individuals designated by the University as a decision-maker in the formal resolution process, must not have a conflict of interest or bias for or against Reporting Parties or Responding Parties generally or an individual Reporting Party or Responding Party; must not rely on sex stereotypes; and must promote impartial investigations and adjudications of Formal Complaints of Sexual Harassment.

88. Further, these individuals must receive training on: the definition of Sexual Harassment; the scope of the University's Educational Program or Activities; how to conduct an investigation and grievance process including hearings, appeals, and informal resolution processes as applicable; and how to serve impartially, including avoiding prejudgment of the facts at issue, conflicts of interest, and bias.

89. The Policy also specifies that hearing officers must receive training on issues of relevance of questions and evidence, including when questions and evidence about the Reporting Party's sexual predisposition or prior sexual behavior are relevant and when they are not relevant, and investigators must receive training on issues of relevance to create an investigative report that fairly summarizes relevant evidence.

**B. Policy on Prohibited Discrimination, Harassment and Related Misconduct Including Sexual and Gender-Based Harassment, Sexual Violence, Interpersonal Violence, and Stalking**

90.    The Policy on Prohibited Discrimination, Harassment and Related Misconduct ("PPDHRM") covers certain sexual misconduct that is not covered by University's Title IX Policy and the procedures are similar to those prescribed by the Title IX Policy.

91.    Upon receipt of a report of conduct covered under the PPDHRM, a response team composed of a group of administrators – the Director of Equal Opportunity and Compliance, the Title IX Compliance Coordinator, a Report and Response Coordinator, and or staff in the Office of the Dean of Students – will offer resources to the Reporting Party and conduct an initial assessment.

92.    The initial assessment considers the nature of the report, the safety of the parties and the campus community, the Reporting Party's preference for resolution, and the necessity for any supportive measures.

93.    As part of the initial assessment, a preliminary meeting will take place between the Reporting Party and the Report and Response Coordinator.

94.    If appropriate, an investigator may also meet with the Reporting Party to gather any necessary information.

95.    The Report and Response Coordinator will address any immediate concerns about the physical safety and emotional well-being of the parties, provide

22

the Reporting Party with information about resources, advise on the procedural options available for resolution of the complaint, notify the party of the option to report to law enforcement, discuss the Reporting Party's preference for resolution, explaining the policy on retaliation, and explain the roles of those involved in the investigation process.

96.     The Report and Response Coordinator will also gather facts that will enable the Associate Vice Chancellor of Equal Opportunity and Compliance/Title IX Coordinator to assess the nature and circumstances of the allegation, refer the matter to EEAC for appropriate action, assess a potential pattern of evidence or similar conduct, determine whether a timely warning under federal law is required, and enter non-identifying information about the report into the University's daily crime log if the conduct is criminal in nature.

97.     When a Responding Party is notified of the allegations during the initial assessment, the Report and Response Coordinator will provide the party with information about resources, the available range of supportive measures, an explanation of procedural options, and the prohibition on retaliation.

98.     Following the initial assessment, the Director of Equal Opportunity and Compliance or the Title IX Compliance Coordinator may:  (i) take no further action (ex: if the conduct alleged would not rise to the level of a violation); (ii)

pursue voluntary resolution; or (iii) pursue investigation and adjudication to determine if disciplinary action is warranted.

99. Upon receipt of a report, the Director of Equal Opportunity and Compliance or the Title IX Compliance Coordinator, in coordination with the Response Team, will make an immediate assessment of the risk of harm to the parties or to the broader campus community and will take steps necessary to address any risks.

100. These steps include establishing interim measures, and may include referral to the EEAC to assess whether any individual poses a serious threat of disruption to the academic process or a danger to themselves, or other members of the University community or University property.

101. If a Reporting Party does not want to move forward with a formal investigation, voluntary resolution may be available. However, the University retains discretion to determine when voluntary resolution is appropriate.

102. Following the initial assessment, and in consultation with the Reporting Party, the University will initiate a prompt, thorough, and impartial investigation, designed to provide a fair and reliable gathering of the facts by a trained and impartial investigator.

103. The Director of Equal Opportunity and Compliance or the Title IX Compliance Coordinator will oversee the investigation.

104.  All individuals, including both parties and any witnesses are to be treated with appropriate sensitivity and respect throughout the investigation.

105.  The Director of Equal Opportunity and Compliance or the Title IX Compliance Coordinator will assign investigator(s) who have training and experience in investigating allegations of prohibited conduct.  The investigator will gather information regarding the alleged conduct, and then determine if the information gathered establishes that the alleged conduct occurred by a preponderance of the evidence and if so, whether the conduct constitutes a violation of the Policy.

106.  The Equal Opportunity and Compliance Office will send the Reporting Party and the Responding Party a written notice of investigation, which constitutes the formal charge.  The notice is to be issued within five (5) business days of receipt of confirmation from the Reporting Party that he or she intends to proceed with an investigation and/or sufficient information for the University to determine that the report raises a potential policy violation.

107.  The Notice of Investigation should contain a summary of the allegations or conduct at issue, the range of potential violations under the Policy, the range of potential sanctions, and information about the prohibition on retaliation.

108. The Notice of Investigation will also include, where appropriate, notification that expulsion is a potential sanction and that expulsion precludes matriculation at any UNC institution.

109. The Director of Equal Opportunity and Compliance and the Title IX Compliance Coordinator will seek to resolve all reports within one academic semester and will use best efforts to complete an investigation within sixty (60) business days from issuance of the Notice of Investigation.

110. During the investigation, the Reporting and Responding Parties will have an equal opportunity to be heard, to submit information, and to identify witnesses who may have relevant information.

111. The investigators will aim to speak separately with the parties, and any other individuals who have relevant information.

112. The investigators will gather any available physical or documentary evidence, including prior statements by the parties or witnesses, any communications, emails, social media, text messages, or other relevant materials, as well as information that is relevant to the determination of an appropriate sanction or remedy, including information regarding impact of the alleged incident on the parties.

113. All community members are expected to cooperate with the EOC office, to assure fairness and procedural due process.

26

114. The EOC will request the appearance of individuals from the University community who can provide relevant evidence.

115. The parties may decline to participate in proceedings, in which case the Director of Equal Opportunity and Compliance or the Title IX Compliance Coordinator will determine whether the investigation and hearing will proceed in the parties' absence.

116. If either party chooses not to appear, the investigators will determine whether the available evidence establishes a violation of the Policy.

117. The investigators retain discretion to determine the relevance of any evidence and may exclude information in preparing the investigation report if the information is immaterial, irrelevant, or more prejudicial than informative.

118. The investigators may also exclude statements of personal opinion by witnesses and statements as to general reputation or character.

119. Generally, prior sexual history or pattern evidence is excluded, except in limited circumstances including the following:

- Where there is evidence of a pattern of similar conduct, regardless of whether there has been a prior finding of a policy violation; where there is a prior finding of a violation for a similar act, there is a presumption of relevance and the finding may be considered in making a determination as to responsibility and assignment of a sanction.

- Where there was a prior or ongoing relationship between the parties and responding party asserts that consent was sought and given.

- A party's sexual history with an individual other than the reporting party may be relevant to prove intent, motive, absence of mistake, or to explain an injury.

120. The University has discretion to consolidate multiple reports into one investigation, or one hearing before a single Hearing Officer, if the information related to each incident would be relevant and probative in reaching a determination.

121. Both parties have an opportunity to submit a written impact statement, the purpose of which is to provide relevant information about how the alleged conduct has affected their access to educational programs, activities, and opportunities. It may also include any mitigating or aggravating factors to be considered in the sanctioning phase.

122. Impact statements will not be considered when determining responsibility, but will only be reviewed when deciding upon a sanction.

123. At the conclusion of the investigation, the investigators will prepare a written report summarizing the information gathered and noting the areas of agreement and disagreement between the parties.

124. Before the report is finalized, the parties will each have an opportunity to review the draft report and submit any final additional comments or information to the investigators within five (5) business days.

125. Subsequently, the investigators will consider the statements and address any new information, before finalizing the investigation report.

126. The final report includes an investigative finding, which determines whether the Responding Party violated a policy by the preponderance of the evidence standard.

127. In reaching the finding, the investigators will consult with the Director of Equal Opportunity and Compliance, the Title IX Compliance Coordinator, and any other designated administrator who has relevant information. The investigators may also consult with the Dean of Students regarding any prior disciplinary history of the Responding Party and the UNC Policy regarding any prior criminal history.

128. Once the investigation finding is issued, each party will meet separately with the Report and Response Coordinator for an outcome conference, at which point the parties will be permitted to review the final investigation report.

129. When there has been an investigation finding that a policy has been violated, the parties may: (i) accept the finding and recommended sanction; (ii) accept the finding but request a hearing on the recommended sanction; or (iii) request a hearing on the finding and the recommended sanction.

130. If either party requests a hearing, the matter will be referred to a Hearing Officer to determine whether a policy violation occurred and/or to determine an appropriate sanction.

131. The Hearing Officer will send a Notice of Hearing to the parties and the investigators identifying the hearing date, location, and other details about the process and procedure.

132. A pre-hearing meeting will take place with each party and the Hearing Officer to discuss the process, address any questions, and raise any new information not previously identified.

133. The investigators are responsible for presenting the evidence supporting the investigative finding at the hearing.

134. After the hearing, the Hearing Officer will make his or her own assessment of whether a policy violation occurred, based upon the relevant facts.

135. The Hearing Officer will issue a Notice of Hearing Outcome within five (5) business days, which shall include the finding, the rationale for the result, a brief summary of evidence on which the finding is based, any sanctions, the date by which they must be satisfied, and information about the appeal process.

136. The policy permits the Hearing Officer wide latitude in deciding upon appropriate sanctions and corrective measures to be imposed, guided by the

understanding that sanctions and/or corrective measures are intended to eliminate prohibited conduct, prevent its recurrence, and remedy its effects.

137. Sanctions and corrective measures may include educational, restorative, rehabilitative, and punitive components.

138. The Policy further notes that some behavior, however, "is so egregious in nature, harmful to the individuals involved, or so deleterious to the educational process that it requires severe sanctions, including suspension from the University or expulsion from the UNC System."

139. In cases resolved through an investigation, the investigator in consultation with the Response Team is responsible for deciding upon an appropriate sanction. In cases that are resolved through the Hearing Officer, the Hearing Officer is responsible for deciding upon appropriate sanctions.

140. In reaching this determination, the investigator or Hearing Officer may solicit information from the Reporting Party, the Responding Party, and any other individual who can provide information relevant to the determination regarding potential sanctions.

141. Some of the factors to be considered when deciding upon sanctions include: (i) the nature and violence of the conduct at issue; (ii) the effects of the conduct on the Reporting Party; (iii) the impact of the conduct on the community or the University; (iv) prior misconduct by the Responding Party and prior

disciplinary history; (v) whether the Responding Party has accepted responsibility for the conduct; (vi) whether the Responding Party demonstrates an understanding of the requirements of the Policy; (vii) maintenance of a safe and respectful environment; (viii) protection of the University community; and (ix) any other mitigating or aggravating factors.

142.  Either party may appeal to an Appeals Officer, an impartial decisionmaker designated by the Chancellor, within five (5) business days.

143.  The appeal must be based on one of the following grounds:  (i) a violation of due process; (ii) material deviation from the Minimum Substantive and Procedural Standards for Student Disciplinary Procedures adopted by the Board of Governors, University of North Carolina Policy Manual §700.4.1; or (iii) newly discovered information has been obtained that was not previously available during the investigation or adjudication process and this new information would substantially affect the outcome.

144.  If the appeal is deemed timely and properly filed, each party will be given the opportunity to review the written appeal and respond to it in writing.

145.  The Appeals Officer may affirm the outcome, alter the outcome, return the matter to the Hearing Officer with instructions to reconvene to cure a procedural error or to assess the weight and impact of newly discovered

information, or where the procedural error cannot be cured by returning the matter to the original Hearing Officer, convene a hearing before a new Hearing Officer.

146. The Appeals Officer will render a written decision on the appeal to both parties within fifteen (15) business days from the date of submission of all documents.

147. Appeal decisions are final except in cases involving expulsion, which allow for further appeal to the Board of Trustees based on specific grounds. This case does not involve expulsion.

148. Sanctions of expulsion, suspension for a definite or indefinite period, probation are all noted on a student's transcript.

### III. *The Sexual Interaction between Plaintiff and Roe and the Aftermath.*

#### A. Plaintiff's interactions with Roe

149. Plaintiff and Jane Roe met each other in the second week of their freshman year, on August 24, 2022.

150. One week later, on August 31, 2022 at 8:04 p.m., a childhood friend of Plaintiff who was also a freshman at UNC ("Friend 1"), invited Plaintiff to her dorm room in text message saying he should come to her room a visit with her, her roommate and Jane Roe.

151.   There, Plaintiff and Roe began flirting verbally and physically. Among other things, Roe played with Plaintiff's tie and hair and the two held hands.

152.   When Friend 1 briefly left them alone in the room, Roe's flirting became more physical and explicitly sexual. At one point, Roe rubbed her butt against Plaintiff's groin.

153.   Around midnight or the early morning hours of September 1, 2022, Friend 1 returned to the room and told Plaintiff and Roe that she wanted to go to sleep.

154.   Plaintiff and Roe left  Friend 1's room together and agreed to go for a walk on campus. On their walk, they stopped at Hooker Fields and began kissing.

155.   As their sexual interaction progressed, Roe told Plaintiff she was concerned that someone might see them or that there may be surveillance cameras that could capture their interaction.

156.   When Roe expressed these concerns, Plaintiff immediately stopped the sexual contact and talked with Roe about her concerns.  He noted that few people were out on campus, it was dark where they were, and that, in that location, they would not be visible to any person or surveillance camera.

157.   Roe resumed the sexual contact, kissing him. Again, the sexual contact escalated and the two went down to the ground, where they were sitting up

34

with Roe on Plaintiff's lap, facing him, straddling him and rubbing her pelvis against his penis.

158.   Plaintiff placed Roe's hand on his groin and Roe began massaging his penis, and Plaintiff pulled Roe's shorts down leaving her underwear in place.

159.   Plaintiff asked Roe if she was on "the pill" and Roe answered, "yes".

160.   Plaintiff then asked Roe if she had any STIs (sexually transmitted infections ("STIs") and Roe answered "no".

161.   Plaintiff then asked Roe, "do you want me?"

162.   Roe responded affirmatively by nodding her head.

163.   With Roe's assistance, Plaintiff moved Roe's underwear to the side and Plaintiff and Roe engaged in vaginal sexual intercourse, initially in the position the two were in at the time – with Roe on top of Plaintiff – and then changing to the missionary position until the intercourse concluded.

164.   At no time did Roe give any indication that she wished to withdraw her consent to sexual intercourse with Plaintiff. To the contrary, Roe was an active participant in the sexual intercourse throughout the interaction.

165.   Afterwards, Plaintiff and Roe walked back to their dorm, sat outside of the dorm on a bench and continued talking. During their conversation, Roe told Plaintiff that she enjoyed their sexual encounter, expressed excitement about

continuing their relationship, and then said she hoped Plaintiff would not "leave [her] because everyone leaves [her]."

166.   Plaintiff told Roe that he did not yet share her interest in pursuing a relationship with Roe but that he hoped they would be friends.

167.   Roe was visibly upset by this response, and told Plaintiff that she sometimes "act[s] crazy" which she attributed to "a tumor in [her] brain." Plaintiff expressed his sympathy but did not inquire further.

168.   After roughly 20 minutes talking on the bench Plaintiff told Roe that he needed to go to bed because he had an early class the next day, they parted ways and Plaintiff went to his room alone, arriving there at round 2:00 a.m. This account is corroborated by the University's records of Plaintiff's electronic access to his dorm via the electronic key issued to Plaintiff by the University.

**B.** **Complainant immediately presents to the ED seeking only STI testing.**

169.   As Plaintiff was returning home to sleep, Roe sent a test message to Friend 1 stating, "I fucked up."

170.   Friend 1 replied asking Roe what she was referring to, but Roe did not elaborate or explain what she meant.

171.   Roe then called a friend in California ("Friend 2").

172.   Roe then went to the UNC Hospital's emergency department.

36

173. According to Roe's medical records, Roe's sole purpose was to be tested for sexually transmitted infections (STIs).

174. Roe presented to the ED at or around 2:09 a.m., requested a full battery of STI testing.

175. Those records also show that Roe reported to her treating professionals that she just had consensual unprotected sex with a guy she had been talking to for a while. When asked if she felt she had been raped, Roe said "no." Roe reported that she "felt pressured to give in because he was persistent and eventually said ok" but now "has regret."

176. Roe also told her treating professionals that she was on the birth control pill and takes it as prescribed although she missed a dose the day before having sexual intercourse with Plaintiff.

177. Within an hour of providing a sample for testing, at around 3:30 a.m., the lab reported that Roe tested positive for Chlamydia. This result was available to Plaintiff via UNC's electronic chart at that time.

178. Chlamydia cannot be detected by the test until roughly one week after exposure. Roe tested positive for chlamydia roughly two hours after her sexual contact with Plaintiff.

37

## C. **Roe Informs Plaintiff That She Has an STI**

179.  The next day, September 2, 2022, Roe told Friend 1 about her STI diagnosis.  Friend 1 sent Plaintiff a message directing him to go to the 2nd floor lounge in the dorm where all three lived. Plaintiff asked why and Friend 1  advised Plaintiff that Roe needed to talk to him and that it was urgent that he meet Roe.

180.  Plaintiff met Roe in the lounge. Roe told Plaintiff that he might want to have a seat and proceeded to inform Plaintiff that she had tested positive for an STI. Roe did not say when she got tested nor did she provide Plaintiff any report detailing the results.

181.  Plaintiff was upset and expressed his anger over the fact that she had told him she did not have an STI before they had sex.  In response, Roe began accusing Plaintiff of giving it to her, despite the fact that it was impossible for her to test positive for said STI based on sexual contact within hours of the test.

182.  Roe then told Plaintiff that they could "get through this together" and offered to get the medication to treat Plaintiff for him. She explained that she would lie to her doctor that she had thrown up one of her pills, which, according to Roe, would require her doctor to give her a new prescription for the entire course of treatment. Roe would then fill the second prescription and give it to Plaintiff.

183.   Plaintiff reluctantly acquiesced in Roe's plan, in part, because, being 17 years old, Plaintiff feared that a positive test and prescription issued for an STI would be reported to or at least accessible by his parents.

184.   Then Plaintiff mentioned that he thought she was going to tell him that she was pregnant and was relieved at least to know that was not the reason.

185.   Roe responded by telling Plaintiff that, contrary to her assurances the night before, she had not taken her birth control pill for three days leading up to the night they had sexual intercourse. Plaintiff was incredulous because she had assured him that she was "on the pill".

186.   Plaintiff then told Roe he wanted to get her emergency contraception pill (Plan B) and they went to the student union pharmacy only to find it closed for the night.

187.   On September 3, 2022, while Plaintiff was traveling home for Labor Day weekend, Roe sent messages indicating that the ER had emergency contraceptives that were effective for up to five days following intercourse.

188.   The following day, September 4, 2022, Roe told Plaintiff that she went to get the emergency contraceptive and that the hospital required her to take a test to confirm she was in fact pregnant. Roe claimed that the test revealed that her hormone levels indicated she was likely pregnant – *three days* after engaging in sex with Plaintiff. Roe did not explain this further.

189.   Two days later, on September 6, 2022, Roe messaged Plaintiff as he was on the train returning to school, claiming that she had taken another test, according to which she was "still pregnant."

190.   Soon after Plaintiff returned to his dorm on September 6, 2022, Roe left Plaintiff the full prescription to treat the alleged STI in a white bag outside of his room, which was the prescription she obtained by lying to professionals at the hospital  claiming she threw up one of the pills.

191.   On September 7, 2022, at Roe's request, she and Plaintiff met to talk about Roe's purported pregnancy in the event the emergency contraceptive failed. When the subject of abortion came up, Roe claimed that her parents would kill her if they found out she had an abortion and said that she would rather kill herself, suggesting at one point that she should throw herself in front of a bus that was approaching.

192.   Roe then suggested that they walk over to Hooker Field, where they had sex on September 1, 2022. There, Roe asked Plaintiff if they should "do it again here." Plaintiff declined.

193.   Both also played music and were laughing and dancing at Hooker Field – one week after the alleged sexual assault – when Friend 1 and her roommate saw both and approached Roe, told her that she should not be there with

Plaintiff, and asked Roe to leave with them. Roe rebuffed the request of Friend 1 and continued dancing with Plaintiff.

194.  On the walk back to the dorm, Roe and Plaintiff agreed to go to Planned Parenthood together. Plaintiff then made an appointment at Planned Parenthood for two weeks later on September 22, 2022.

195.  On September 8, 2022, Roe asked if Plaintiff would watch YouTube with her in Plaintiff's room. Plaintiff acquiesced and, while watching videos, Roe held his hand and suggested to Plaintiff that they could have sex without transmitting the STI since they both "already have it." In addition, Roe brought condoms with her to Plaintiff's room, gave them to Plaintiff. Plaintiff declined the suggestion and Roe said they were "for next time."

196.  On September 9, 2022, Roe left campus to attend a weekend retreat. While there, Roe sent Plaintiff a message saying that she wanted to make all decisions and concerning her purported pregnancy and that Plaintiff should stay out of her life. Roe also claimed that the hospital fees and tests cost $60 and told Plaintiff he could give that to her when she returned from the retreat.

197.  Upon Roe's return to campus, Plaintiff went to her room and gave her $60 in cash.

198.  After this, the two had no further meaningful interactions with one another.

41

199. Roe did not inform Plaintiff of any further developments concerning her purported pregnancy, the September 22 appointment Plaintiff scheduled with Planned Parenthood, or any other matter.

### D. **Roe Makes False Claims Concerning Her Sexual Interaction with Plaintiff**

200. On November 8, 2022, the Equal Opportunity and Compliance Office (EOC) received a Responsible Employee Report that Roe was sexually assaulted on campus.

201. On February 4, 2023, Roe requested a meeting with EOC investigators for an assessment interview.

202. On March 9, 2023, in a meeting with EOC investigators, Roe alleged that Plaintiff engaged in possible violations of the Title IX and PPDHRM policies. Among other things, Roe falsely claimed that Plaintiff placed her hand on his groin area without her consent; had sexual intercourse without her consent; and that Plaintiff gave her an STI in the process. Roe knew that all of these allegations were false.

203. The EOC investigators prepared a statement of charges based on Roe's allegations and emailed the statement of charges to Roe with a request to confirm their accuracy and to advise them whether she wished to proceed with a formal complaint.

204. On March 20, 2023, Roe confirmed via email to the EOC that the statement of charges the EOC prepared was accurate and that Roe wished to proceed with a formal complaint against Plaintiff based on them.

205. The EEOC determined that it had jurisdiction over all of the charges, either under the Title IX Policy or the PPDHRM policy.

### IV. EOC Issues the Notices of Charges and Conducts the Investigation.

206. On March 24, 2023, the EOC issued a notice of charges and investigation based on Roe's allegations.

207. Specifically, the Notice provided that the EOC would pursue Roe's allegation that, during their sexual contact on 31 August 2022 at Hooker Field, Plaintiff (1) "recklessly and/or knowingly exposed the Reporting Party to a sexually transmitted infection without her knowledge"; (2) "penetrated the Reporting Party's vagina with his penis without her consent"; and (3) "placed the Reporting Party's hand on his penis without her consent."

208. The first charge was a violation of the Policy on Prohibited Discrimination, Harassment, and Related Misconduct (PPDHRM); the second and third charges were violations of the Title IX Policy. The EOC determined that all three of the charges would be investigated and adjudicated under the Title IX Policy and Procedures.

### E. **Plaintiff obtains comprehensive testing that conclusively refute the charge that he exposed Roe to an STI**

209.   Plaintiff received the Notice of Charges and Investigation on March 24, 2022, and promptly obtained comprehensive STI testing, including a full panel of tests to detect any STI antibodies present in his blood, as well as a three-part series of STI antibody tests to ascertain whether he had or ever had the STI that Roe alleged Plaintiff transmitted to her.

210.   On April 3, 2023, a report of the STI testing showed that all tests for STIs were either "negative" or "not detected." Specifically, the three antibody tests for the STI alleged by Roe were referenced as "IGA, ITT and IGA." All three results were reported as "Antibody Not Detected." The report explains the standard scientific premises that IGM detection indicates a <u>recent</u> <u>infection</u>, ITT detection indicates a <u>past exposure</u>, and IGA detection indicates a <u>primary</u>, <u>current</u> or <u>chronic infection</u>. In short, the testing conclusively established that Plaintiff never had an STI nor contracted an STI from Roe.

### F. **Plaintiff files an EOC Complaint against Roe based on the STI test results**

211.   On April 17, 2923, Plaintiff promptly reported these findings to the EOC investigators in two submissions to the EOC: (1) as evidence refuting the EOC's charge that he knowingly or recklessly exposed Roe to an STI infection and (2) in a Formal Complaint of his own against Roe.

44

212. As explained below, the EOC Investigators ignored this evidence entirely; they would maintain the demonstrably false charge that Plaintiff exposed Roe to a sexually transmitted chlamydia infection throughout the proceedings, and they would refuse to charge Roe with the same violation in light of the results of the tests (which would be corroborated by Roe's own medical records).

## V.     The Procedurally Defective and Biased Investigation and Hearing

213. Plaintiff was interviewed by Investigators Feeney and Froehling on or about April 17, 2023, concerning Roe's allegations and complaint.

214. Plaintiff was interviewed by Defendant Enlow concerning his complaint against Roe. Enlow and Hall refused to proceed on Plaintiff's allegations against Roe that she exposed him to an STI, despite maintaining Roe's now-demonstrably false charge that Plaintiff exposed Roe to an STI.

215. On or about June 20, 2023, the EOC issued the investigators' draft investigative report.

216. On or about July 12, 2023, Plaintiff submitted a written response to the draft investigation report. Roe did not submit any response to the draft report.

217. On August 16, 2023, the EOC issued a Notice of Hearing, indicating the hearing would be held on September 6 and 8, 2023.

218. On August 22, 2023, the EOC issued its Final Investigation Report.

219.   On August 24, 2023, Roe appeared for her prehearing meeting with the Hearing Officer.

220.   On August 25, 2023, Plaintiff appeared for his prehearing meeting with the Hearing Officer.

221.   The hearing was held over the course of three days, September 11, 13 and 19, 2023.

222.   The Hearing Officer found Plaintiff responsible for sexual misconduct and not responsible for exposing Roe to an STI. The Hearing Officer suspended Plaintiff for one full academic year. The university's Appeals Officer denied Plaintiff's appeal.

A. **Deprivation of Plaintiff's right to cross-examine his accuser**.

223.   It is well established that cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of truth."  3 Wigmore, Evidence §1367, p. 27 (2d ed. 1923).  This is especially true in cases where credibility of the parties is at issue, as is often the case in matters revolving around sexual misconduct allegations.

*224.*  As has been recognized by various judicial circuits "[t]he basic elements of federal procedural fairness in a Title IX sexual-misconduct proceeding include a real, meaningful hearing and, when credibility determinations are at issue, the opportunity for cross-examination of witnesses." *Doe v. University of*

*the Sciences,* 961 F.3d 203, 214-215 (3ʳᵈ Cir. 2020). *See also Doe v. Purdue Univ.,* 928 F.3d 652 (7th Cir. 2019); *Doe v. Baum,* 903 F.3d 575 (6th Cir. 2018); *Haidak v. Univ. of Massachusetts-Amherst,* 933 F.3d 56 (1st Cir. 2019); *Walsh v. Hodge*, 975 F.3d 475 (5th Cir. 2020).

225. Here, while UNC's policies expressly provide that each party is permitted to cross-examine the other party and witnesses at a hearing, Plaintiff was denied this right.

226. For example, notwithstanding the evidence of a) Plaintiff not having or transmitting the STI that Roe claimed, b) Roe testing positive for the STI within twenty-four hours after sexual intercourse with Plaintiff and c) Roe informing Plaintiff that she was pregnant, UNC withheld relevant parts of Roe's medical records from Plaintiff during its investigation of Roe's complaint.

227. During the hearing, the Hearing Officer prohibited Plaintiff from cross-examining Roe on the facts directly relevant to her credibility despite clear evidence that she had made multiple false statements of material fact throughout the proceedings, including, but not limited to, not being sexually active prior to engaging in sex with Plaintiff, not having or transmitting an STI to Plaintiff, or that it was Roe who exposed Plaintiff to an STI.

228. The Hearing Officer further prohibited Plaintiff from presenting credible, scientific evidence concerning victim responses to sexual assault while

47

permitting Roe to present evidence intended to show that her own incongruous conduct following the parties' sexual contact was consistent with being a victim of sexual assault.

## VI. *The Erroneous Finding of Responsibility.*

229. The Officer's decision was problematic in numerous additional ways, as discussed in detail below.

### A. <u>The Hearing Officer improperly relied on "Facts" that were contradicted by the record.</u>

230. The Hearing Officer erroneously found that Roe did not give her consent to sex with Plaintiff, in contradiction of Roe's acknowledgement to medical staff at the hospital on September 1, 2023 that she "felt pressured to have sex but said ok . . . did not want to press charges . . . and feels safe," and that she "feels regretful after [sex] but does not feel that she was raped or want to press charges at this time."

231. The Hearing Officer further erroneously found that Roe did not consent to sex while failing to consider that Roe's physical actions signaled her consent.

### B. <u>The Hearing Officer improperly found "facts" that have no evidentiary support in the record.</u>

232. Notwithstanding Roe telling hospital staff that she "felt pressured . . .

but said ok . . . feels safe," and was "not raped," when questioned at the hearing about her acknowledgements to the hospital staff, Roe responded:

> You know, these are the people… that have all the knowledge. So when asking them, I was careful about my vocabulary. I didn't want to sound any alarms and - so to speak – to say hey, I think I was, you know, raped. And then they would call the police or that they would involuntarily commit me.

233.   Roe's explanation for making contemporaneous communications to her treating medical professionals that directly contradict her allegations against Plaintiff is nonsensical. Yet, the Hearing Officer accepted Roe's unbelievable explanation for having made contradictory contemporaneous statements to her treating professionals.

234.   And in comparing Roe's testimony with her prior statement to Witness 1 that she was raped, the Hearing Officer stated (speaking in third person):

> The Hearing Officer found that it was reasonable for [Roe] to use different terminology when discussing the sexual encounter with a friend and with staff at a hospital, especially with the power dynamic between [Roe] and the hospital staff. Since the discrepancy in language was reasonable, the Hearing Officer did not find it determinative when considering [Plaintiff's] version of events as it related to consent.

235.   The record, however, is devoid of any facts on which the Hearing Officer could make such a determination of a "power dynamic" between Roe and the hospital staff, or for Roe to use a "different terminology" when describing the

49

sexual encounter with a third-party and the hospital, or that the "discrepancy in language" was reasonable.

### C. The Hearing Officer's arbitrary credibility findings.

236. First, the Hearing Officer found Roe to be credible, in large part because she admitted that she had been dishonest when interviewed by the Investigators.

**237.** Again, without any evidentiary basis, the Hearing Officer arbitrarily dismissed the fact that Roe lied to the hospital staff to obtain a second prescription of antibiotics that she misled Plaintiff to take by summarily stating: ". . . the "Parties had discussed this plan together and that she knew she could get the medication…."

238. While the only facts in the record are that Roe lied to get a second prescription for antibiotics that she gave to Plaintiff, there are no facts to support the Hearing Officer's unsupported supposition that Roe "… knew she could get the medication…" that she lied to obtain.

### D. Roe's false claim that her prior STI testing was "clear"

239. Roe introduced into evidence a copy of her redacted Report of Medical Examination and Vaccination Record from the Department of Homeland

Security, signed on August 23, 2022 ("Report"), which Roe falsely claimed showed that she did not have the STI she accused Plaintiff of transmitting to her.

240. While the Report showed that Roe had tested negative for syphilis and gonorrhea, theses were not the infections that Roe alleged Plaintiff had infected her; in fact, Roe was not tested for the STI she alleged Plaintiff transmitted to her.

241. Notwithstanding the clear indication that Roe had not been tested for the STI that she alleged Plaintiff gave her, she falsely maintained to UNC and third-parties that the Report showed she did not have an STI.

242. These remarkable facts were lost on UNC and its investigators, who assiduously avoided any attempt to investigate this inconsistency. Likewise, the the Hearing Officer assiduously avoided any consideration of in his tortured explanation of why he found Roe to be credible on matters of her sexual encounter with Plaintiff.

**E. The Hearing Officer refused to credit Plaintiff's testimony unless it was corroborated by a third-party witness, while imposing no such limitation on crediting Roe's testimony.**

243. The Hearing Officer further erred when it found Plaintiff to be less credible than Roe because details of Plaintiff's consistent account of the events were not all corroborated by independent, third-party witnesses. This ignores the

51

unremarkable fact that many details relating to a sexual encounter will not be corroborated by third-party witnesses.

### VII.    *Plaintiff's Appeal of the Hearing Officer's Findings and Decision.*

244.    On October 23, 2023, Plaintiff appealed the Hearing Officer's findings and sanction on June 6, 2022, based upon the following grounds:  (i) a procedural irregularity affected the outcome of the matter; (ii) new evidence that could affect the outcome of the matter and was not reasonably available at the time of the determination of responsibility or sanctions; and (iii) the investigators' bias in favor of the reporting party or reporting parties generally, or against the responding party or responding parties generally affected the outcome of the matter.

245.    On December 21, 2023, UNC issued the appeal decision prepared by Defendant Matthews in which she denied all relief Plaintiff sought in his appeal.

246.    Disregarding many of the points raised by Plaintiff in his appeal, Ms. Matthews responded to a select few and ultimately concluded that "the Responding Party has not met their [sic] burden of proof to establish that there was clear and material error in the Hearing Outcome" and thus affirmed the Hearing Officer's findings and sanctions.

247.    Defendant Matthews disregarded numerous points raised by Plaintiff in his appeal and arbitrarily explained away clear procedural errors and biases

committed during the investigation processes, resulting in a mere rubber-stamping of the Hearing Officers' findings rather than a thoughtful, reasoned and objective decision.

248.  The Appeal Officer's decision states that "[n]o further appeals are available from this decision; thus, this is the University's final determination in this matter." Thus, Plaintiff has now exhausted all of his administrative remedies within the University.

## DAMAGES TO PLAINTIFF

249.  As a result of the Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff was subjected to disciplinary processes that failed to comport with the University's promises to Plaintiff as an enrolled student, the tenets of Title IX, and principles of good faith and fundamental fairness.

250.  As a result of Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff was improperly suspended from the entire University of North Carolina system for "at least" one full academic year, depriving him of the benefits of years of hard work and tuition, and his constitutional right to a public education.

251.  As a result of Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual

53

assault and his records from UNC will permanently bear a notation stating that he was expelled for a violating school policies.

252. As a result of Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff's academic/disciplinary file and transcript are now marred by false and baseless findings of sexual assault and a suspension for one full academic year.

253. As a result of Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff will have to disclose to any future educational institution or job that he applies to that he was found responsible for committing sexual assault, effectively destroying any chance for Plaintiff to achieve success academically or professionally in the future.

254. As a result of Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff's education and career paths have been derailed, resulting in considerable economic and consequential harm.

255. As a result of Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff has suffered and will continue to suffer reputational harm, ridicule, persecution, pecuniary harm, deprivation of his education, and damage to his education and career prospects.

256. As a result of Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff has been shunned and cancelled by most, if not all, of

his friends and peers at UNC, his reputation has been permanently destroyed, his scholarship will be revoked and he will be compelled to repay his scholarship sponsor the funds he received thus far.

257. Plaintiff will face further irreparable harm should UNC disclose Plaintiff's disciplinary records to the press, pursuant to the North Carolina Supreme Court's decision in *DTH Media Corp. v Folt*, 841 S.E.2d 251 (N.C. 2020), *cert denied*, 141 S. Ct 1126 (2021). As discussed below, the University has received a public records re      quest from a representative of the Daily Tar Heel, seeking disclosure of Plaintiff's name, the violation he has been found responsible for, and his sanctions.

## COUNT I:  Violation of 42 U.S.C. § 1983-Denial of Fourteenth Amendment Due Process and Conspiracy (Against All Defendants)

258. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

259. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

260. Defendant UNC is a public entity that receives large amounts of state and federal funding and is therefore subject to the Fourteenth Amendment.  UNC,

the UNC System, the Board of Trustees, the Board of Governors, and the Individual Defendants, as state actors, are therefore bound by the requirements of the United States Constitution.

261. UNC, the UNC System, the Board of Trustees, and the Board of Governors as public institutions established by the State of North Carolina as well as the Individual Defendants, as agents of the University and individually, have a duty to provide students equal protection and due process of law by and through any and all policies and procedures set forth by the University and the Constitution of the State of North Carolina.

262. Fourteenth Amendment due process protections are required in higher educational disciplinary proceedings. At a minimum, the Supreme Court has made clear that there are two basic due process requirements: (1) notice; and (2) an opportunity to be heard. *Papin v. Univ. of Miss. Med. Ctr.*, 347 F.Supp.3d 274, 279 (S.D. Miss. Sept. 28, 2018), citing *Flaim v. Med. Coll. Of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005).

263. Where a student at a public university faces suspension through a disciplinary proceeding, a serious property interest is at stake; a disciplinary suspension will have a lasting negative impact on the student's life, so heightened due process protections including a fair and impartial hearing, with the right to present evidence, cross-examine adversarial witnesses and to call witnesses. *Doe*

56

*v. Univ. of Mississippi*, 361 F. Supp. 3d 597, 611 (S.D. Miss. 2019); *Doe v. Baum*, 2018 WL 4265634, at \*\*3-5 (6th Cir. Sept. 7, 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 402-04 (6th Cir. 2017).

264.   Plaintiff, as a student at UNC, faced disciplinary action that included the possibility of suspension or expulsion.  Accordingly, the Due Process provisions of the Fourteenth Amendment applied to the disciplinary processes utilized in Plaintiff's case, and Plaintiff was entitled to a process commensurate with the seriousness of the allegations and potential discipline, sanctions, and repercussions he faced.

265.   It is well established that every person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

266.   It is also well established that a person has a protected property interest in pursuing and continuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

267.   As the Supreme Court and the Fourth Circuit have explained, in answering the question of whether there is a protected interest in continued education at the public university level, the critical inquiry in such cases focuses on

57

whether the procedural processes adopted by the university conformed to due process standards.

268.  There is no question that the University failed to afford Plaintiff the minimum procedural safeguards that due process requires before imposing an indefinite suspension for a minimum of a year and a half and barring Plaintiff from making progress towards his degree.

269.  There also is no question that Plaintiff possessed both a constitutionally protected property and liberty interest.

270.  Plaintiff's constitutionally protected property interest in his continued enrollment at UNC, and his right to be free from an arbitrary dismissal, derives from the policies, courses of conduct, practices and understandings established by UNC, as well as the express and implied contractual relationship between UNC and Plaintiff.

271.  By their very nature, the applicable University conduct policies and procedures create a student right to continued enrollment and the right to be free from arbitrary and capricious decision making and sanctions, by providing that: (i) "[t]he University does not unlawfully discriminate in offering equal access to its educational programs and activities"; and (ii) "[t]he University recognizes the rights of all members of the University community to learn and work in an environment that is free from Discrimination and Harassment."

272.  Furthermore, the UNC System has adopted a Policy on Minimum Substantive and Procedural Standards for Student Disciplinary Proceedings ("Policy on Minimum Substantive and Procedural Standards"), which is incorporated into the UNC Policy Manual.

273.  The Policy on Minimum Substantive and Procedural Standards describes its purpose as being "to establish legally supportable, fair, effective and efficient procedures for student disciplinary proceedings," which it seeks to accomplish by imposing minimum standards for such proceedings that purportedly "exceed the requirements of due process and therefore complying with these requirements will also result in providing due process."

274.  The Policy on Minimum Substantive and Procedural Standards goes on to describe the following procedural and substantive standards that must be afforded in any student disciplinary proceeding, as follows:

- *Procedural:*  requires notice and an opportunity for a hearing.

- *Substantive:*  requires that the decision reached be neither arbitrary nor capricious.

275.  Furthermore, the Code of Conduct, Section 502(D)(3) assures that "[i]n the discharge of the chancellor's duty with respect to matters of student discipline, it shall be the duty of the chancellor to secure to every student the right to due process."

59

276.   In consideration of the foregoing guarantees, UNC's policies created a property right in Plaintiff's continued enrollment with the University, and a contractual right to protection against an arbitrary dismissal.

277.   Plaintiff further has a constitutionally protected liberty interest because the allegations brought against Plaintiff ultimately resulted in in a separation of at least a year and a half from the UNC system, a sanction that will have significant and lifelong ramifications with respect to his education, employment, and reputation.

278.   Plaintiff was wrongly held responsible for sexual misconduct, a charge that by its nature plainly implies "the existence of serious character defects such as dishonesty or immorality." *Ridpath v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 308 (4th Cir. 2006).

279.   Thus, unless overturned, Plaintiff's wrongful suspension for sexual misconduct will remain a part of Plaintiff's permanent educational records and the stigmatizing label associated with the finding will impair his ability to seek further education or employment.  Absent the relief sought in this action, other individuals will inevitably come to learn of Plaintiff's suspension due to a purportedly "fair and impartial" finding of sexual misconduct that is, in fact, arbitrary, wrongful, discriminatory and erroneous.

280.   Throughout the investigation and adjudication of the charges against

Plaintiff, Defendants, individually and in concert, expressly and tacitly conspired to violate Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment when they deprived him of the minimal requirements of due process in light of the consequences of the proceedings, fundamental procedural fairness, and a meaningful opportunity to have and present evidence, cross-examine, and be heard by a fair and impartial decisionmaker in a fair and impartial hearing.

### a. Due Process Violations.

281.  First, Plaintiff was deprived of a meaningful opportunity to be heard and a fair and impartial investigation and hearing before he was suspended from the University for one full academic year, triggering the loss of his scholarship, and the imminent publication of his name, the violation he was wrongfully found responsible for and his sanctions.

282.  In furtherance of the conspiracy, Plaintiff was deprived of a meaningful opportunity to be heard when he was prevented from cross-examining his accuser on matters that were directly relevant to the accuser's credibility, consent, and the material facts of her allegations. This deprivation of Plaintiff's right to cross-examine his accuser was discriminatory and directly and foreseeably led to dispositive and erroneous findings made by the Hearing Officer that were dispositive of his finding of responsibility and to Plaintiff's sanctions.

283. While UNC's policies afford the accused student a right to cross-examine his accuser at a hearing, Plaintiff was denied this right at multiple, critical points in the proceedings.

284. Prohibiting Plaintiff from cross-examining his accuser (Roe) on facts directly relevant to her credibility, despite clear evidence that she had made multiple false statements of material fact throughout the proceedings;

285. Prohibiting Plaintiff from presenting evidence concerning responses to sexual assault while permitting the accuser to present evidence explaining her own incongruous conduct following the parties' sexual contact.

286. Defendants' actions had the purpose and effect of failing to provide Plaintiff with reasonable notice of the charges and a fair opportunity to present a defense, which was in violation of Plaintiffs' due process rights and caused him to suffer irreparable harm to his education, livelihood and reputation.

### c. *Liability of the Individual Defendants.*

287. Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

288. The Individual Defendants, as well as other agents, representatives,

62

and employees of UNC acted under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

289. Plaintiff seeks to hold the Individual Defendants liable in their individual capacities because they knowingly violated Plaintiff's clearly established constitutional rights, as well as UNC policies, when they took unlawful actions that led to his suspension from the University.

290. Defendants Hall, Feeney, Froehling, and Enlow knowingly violated Plaintiff's clearly established rights to a fair hearing that caused a deprivation of Plaintiff's due process rights by failing, among other things, to gather all relevant evidence as UNC is required to do pursuant to Title IX.

291.

292. Without regard for Plaintiff's due process rights, the Individual Defendants individually and collectively engaged in biased investigatory and adjudicatory processes that resulted in the improper suspension of Plaintiff from the University and the UNC System.

293. As fully detailed above, the unlawful actions taken by the Individual Defendants, acting in their individual capacities, were motivated by a malicious motive or intent or, at the very least, reckless or callous indifference to Plaintiff's right to due process, warranting an award of punitive damages to Plaintiff.

294. In addition, as part of this action, Plaintiff seeks prospective injunctive

relief against Defendant Guskiewicz in his official capacity, in the form of reinstatement to the University and the UNC System and a prohibition against acting in any way based upon the outcome of the proceedings against Plaintiff.

295.  For an injunction ordering prospective relief in a case involving a sexual misconduct proceeding at UNC, the joinder of Defendant Guskiewicz in his official capacity is necessary for purposes of implementation of the requested prospective relief.

296.  The Supreme Court's *Ex parte Young* decision instructs that Eleventh Amendment immunity does not bar a plaintiff's request for prospective injunctive relief or declaratory judgment against a state actor named in their official capacity. *See generally Ex parte Young*, 209 U.S. 123, 150-156 (1908).  *See also Green v. Mansour*, 474 U.S. 64 (1985) (determining declaratory relief is within *Ex parte Young*'s purview when violations of federal law are threatened or ongoing).

297.  As a result of these due process violations, Plaintiff continues to suffer substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damage, economic injuries and other direct and consequential damages.

298.  As a result of the foregoing, Plaintiff has standing to seek, and is entitled to, an injunction and order vacating the disciplinary findings and decisions reached in the proceedings against Plaintiff, an expungement of any reference to

the disciplinary proceedings in Plaintiff's educational records, and permitting Plaintiff to continue as a student in good standing at UNC until the conclusion of the proceedings on this complaint and, subsequently, on a permanent basis.

299. As a result of the foregoing, Plaintiff is entitled to prospective relief against Defendants, and compensatory and punitive damages against the Individual Defendants acting in their individual capacities in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### COUNT II:  Violation of 20 U.S.C. § 1681 *et seq.*— Title IX—Erroneous Outcome and Conspiracy (Against UNC)

300. Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

#### a. The Effect of the "April 2011 Dear Colleague Letter" on University Sexual Misconduct Policies.

301. On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").  U.S. Department of Education, *Dear Colleague* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "Dear Colleague Letter" or "DCL").

302. The DCL advised recipients that sexual violence constitutes sexual

harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

303. The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims:  A Struggle for Justice*, NATIONAL PUBLIC RADIO (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result.  Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

304. The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college."  DCL at 2.  The

researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus."  *See* Christopher Krebs and Christine Lindquist*, Setting the Record Straight on "1 in 5"*, TIME MAGAZINE (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record straight/

305.   Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof— "more likely than not"—in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.  (DCL at 10-11)

306. The DCL (at 12) also strongly discouraged allowing cross-examination because it "may be traumatic or intimidating" to the alleged victim.

307.  Despite its supposed purpose as a mere guidance letter, the Department of Education ("DOE") treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

308.  Before the DCL, colleges and universities generally did not use their disciplinary procedures to adjudicate sexual misconduct cases and certainly not in

the manner and frequency that they have since the issuance of the DCL.

309.   After the DCL was published, schools changed their sexual assault and sexual harassment policies and procedures.

310.   On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."  OCR's April 2014 Q&A at 9, 12; http://www2.ed/gov./about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

311.   The OCR's April 2014 Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant."  *Id.* at 31.

312.    In the same month that the OCR issued its April 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds."  *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.

313.   The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

314.   In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.  *See* Testimony of Catherine E. Lhamon, Assistant Secretary Office for Civil Rights, U.S. Department of Education (June 26, 2014), https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

315.   To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.   To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, CHRONICLE OF HIGHER EDUCATION, https://projects.chronicle.com/titleix/ (last visited August 11, 2022).

316.   The threat of revocation of federal funds—the ultimate penalty—was

a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct.

317. Colleges and universities including UNC, were fearful of and concerned about being investigated or sanctioned by the Department of Education and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). In response to pressure from OCR, DOJ, and the Obama White House, educational institutions, like UNC, limited procedural protections afforded to males, like Plaintiff, in sexual misconduct cases.

318. On September 7, 2017, Department of Education Secretary Betsy DeVos vowed to replace the "failed system" of campus sexual assault enforcement to ensure fairness for both accusers and the accused, proclaiming that "one person denied due process is one too many." Press Release, *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

319. On September 22, 2017, the OCR formally rescinded the DCL and the April 2014 Q&A and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Department of Education, Dear Colleague Letter (Sept. 22, 2017),

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf;

*see also* Department of Education, *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

320.   In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*." Dep't of Educ., DCL (Sept. 22, 2017), https ://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf (citations omitted) (emphasis added).

321.   On November 16, 2018, the Department of Education released proposed Title IX regulations, subject to "notice-and-comment rulemaking." *Secretary DeVos: Proposed Title IX Rule Provides Clarity for Schools, Support for Survivors, and Due Process Rights for All* (Nov. 16, 2018, 9:41 a.m.) https://content.govdelivery.com/accounts/USED/bulletins/21bcf5b.

322.   Despite a different direction announced by the Trump Administration, colleges universities, and educational programs including UNC mostly continued with victim-centered practices and policies in place during the Obama Administration, holding on, as a matter of ideological commitment, to what is a gender biased enforcement of Title IX.

71

323.    In January 2020, NASPA, the national organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1500 institutions, issued a study, *"Expanding the Frame: Institutional Responses to Students Accused of Sexual Misconduct."* (available at https://www.naspa.org/report/expanding-the-frame-institutional-responses-to-students-accused-of-sexual-misconduct. The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially evidenced to the contrary that widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication.

324.    In a process governed by the enforcement of Title IX gender equality, and in which overwhelming the majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal." While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services

72

available." The study suggests that accused students are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

325. On May 6, 2020, the United States Department of Education released new Title IX regulations, which carried the force and effect of law as of August 14, 2020. ("US Department of Education Releases Final Title IX Rule," available at https://www2.ed.gov/about/offices/list/ocr/newsroom.html.)

326. The new Title IX regulations provided respondents certain procedural rights, including without limitation: (i) a presumption of innocence until a finding of responsibility is made at the conclusion of the process; (ii) the right to review evidence directly related to the allegations with at least ten (10) days to review and respond; (iii) the right to review an investigative report that fairly summarizes relevant evidence and a minimum of ten (10) days in which to respond to the investigative report; (iv) an assurance that Title IX personnel are free from conflicts of interest or bias; and (v) the right to a live hearing in which each party's advisor may ask the other party and any witnesses all relevant questions, including those challenging credibility, with such cross-examination to be conducted directly, orally, and in real time. (*See* "Summary of Major Provisions of the Department of Education's Title IX Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf.)

327.  The May 2020 regulations took effect on August 14, 2020.

328.  On June 23, 2022, the Biden Administration issued a Notice of Proposed Rulemaking regarding proposed changes to the regulations once again, proclaiming that the amendments will "restore crucial protections for students who are victims of sexual harassment, assault, and sex-based discrimination- a critical safety net for survivors that was weakened under previous regulations."

329.  As these most recent proposed regulations were in the notice and comment period at the time of the conduct at issue in this action; as such, they are not applicable to the investigation and adjudication of either Roe's complaint or Plaintiff's complaint.

### b. UNC Has Faced Public Pressure Regarding Sexual Misconduct Complaints.

330.  In addition to the foregoing events, the University's actions and decision-making in its handling of the complaints against Plaintiff were informed by ongoing external and internal pressures on UNC to aggressively pursue complaints of sexual misconduct against male students, in response to events dating back to 2013.

### i. Former and Current UNC Students Speak Out Against the University's Handling of Sexual Misconduct Complaints and Resulting Investigations.

331. Beginning in 2013, UNC became the subject of particular scrutiny after several current and former students, including Andrea Pino and Annie Clark, spoke out publicly about the University's improper and inadequate handling of their complaints of sexual misconduct, leading to considerable negative publicity surrounding the University.

332. The students went on to file complaints with the Department of Education's Office for Civil Rights regarding UNC's mishandling of sexual assault and harassment complaints. Caitlin McCabe, *5 submit complaint against UNC over sexual assault,* THE DAILY TAR HEEL (Jan. 16, 2013, 11:52 pm) https://www.dailytarheel.com/article/2013/01/5-submit-complaint-against-unc-over-sexual-assault; *UNC Comes Under Fire in Sexual Assault Case*, CAROLINA ALUMNI REVIEW (Mar. 4, 2013), https://alumni.unc.edu/news/unc-comes-under-fire-in-sexual-assault-case/; *Federal complaint accused UNC of 'indifference' toward sexual assault*, WRAL.COM https://www.wral.com/federal-complaint-accuses-unc-of-indifference-toward-sexual-assault/12006671/ (last updated Jan. 21, 2013, 7:48 pm); *UNC student who says she was raped facing honor code violation,* WRAL.COM, https://www.wral.com/unc-student-who-says-she-was-raped-facing-honor-code-violation/12150684/ (last updated Feb. 26, 2013, 11:34 pm); Nina Strochlic, *Expelled for Speaking Out About Rape?,* THE DAILY BEAST, https://www.thedailybeast.com/expelled-for-speaking-out-about-rape (published

Feb. 28, 2013, 4:45 am; last updated July 12, 2017, 1:04 am); Shelley Ng, *College student could be expelled for reporting her rape and creating an 'intimidating environment' for her alleged rapist*, NEW YORK DAILY NEWS (Feb. 27, 2013, 6:19 pm) https://www.nydailynews.com/news/national/unc-woman-faces-expulsion-reporting-rape-article-1.1274035.

333.  Among the complaints was that of female UNC student Landen Gambill, who faced an honor code violation in retaliation for submitting a sexual misconduct complaint to UNC.  Associated Press, *Rally planned at UNC-CH on sexual assault issues*, WINSTON-SALEM JOURNAL, https://journalnow.com/rally-planned-at-unc-ch-on-sexual-assault-issues/article_04a40f5c-8226-11e2-ab00-001a4bcf6878.html (published Feb. 28, 2013, updated Apr. 16, 2021); see also *UNC student who says she was raped facing honor code violation,* WRAL.COM, https://www.wral.com/unc-student-who-says-she-was-raped-facing-honor-code-violation/12150684/ (last updated Feb. 26, 2013, 11:34 pm); Strochlic, *supra* ¶ 2.

334.  As a result, the hashtag "#IStandWithLanden" took off on social media, demonstrating the public's support of the complainant, and its outrage over the University's actions in response to Gambill's sexual misconduct complaint. Associated Press, *Rally planned at UNC-CH on sexual assault issues*, WINSTON-SALEM JOURNAL, https://journalnow.com/rally-planned-at-unc-ch-on-sexual-assault-issues/article_04a40f5c-8226-11e2-ab00-001a4bcf6878.html (published

76

Feb. 28, 2013, updated Apr. 16, 2021); *see also* @coronerkid, Twitter (Feb. 25, 2013, 9:03 pm) https://twitter.com/coronerkid/status/306222814309003266 (stating "You CANNOT violate an honor code for GETTING RAPED. That's straight up VICTIM-BLAMING, which is straight up NOT OKAY. #istandwithlanden"); @sarahnev, Twitter (Feb. 28, 2013, 7:03 pm) https://twitter.com/saranev/status/307279930218131457 (noting that she was "[g]rateful for women like Landen who speak out [and d]isgusted by those who think she is wrong. #IStandWithLanden"); @EMMulligan13, Twitter (Feb. 25, 2013) https://twitter.com/EMMulligan13/status/306138029209309184 (noting that she "[j]ust read about what's going on at UNC and #IstandwithLanden[] [t]he university is completely in the wrong."); @TheOnlyBlythe, Twitter (Feb. 26, 2013) https://twitter.com/TheOnlyBlythe/status/306551463629447168 (stating "WTF, colleges? Rape happens everyday on campus- FIX IT. Don't blame those who take a stand. #istandwithlanden").

335. These events also prompted students of the University to launch a group called SAFER Carolina, comprised of "Survivors and Allies for Empowerment and Reform", which describes itself as "a movement dedicated to raising awareness about gender-based violence and pushing for change at UNC-Chapel Hill." SAFER Carolina, FACEBOOK.COM, https://www.facebook.com/SAFER-Carolina-141455316013512.

336. In response to the growing concerns and outcry regarding the University's culture of sexual violence and hostility, students launched an online petition (the "Petition"), urging UNC's Chancellor and the Board of Trustees to take action to change policies and trainings regarding sexual misconduct complaints and the resulting process. SAFER Carolina, *Chancellor Thorp and The UNC Board of Trustees: Take Action Against the Culture of Sexual Violence and Hostility at UNC*, CHANGE.ORG, https://www.change.org/p/chancellor-thorp-and-the-unc-board-of-trustees-take-action-against-the-culture-of-sexual-violence-and-hostility-at-unc?utm_source=share_petition&utm_medium=url_share&utm_campaign=url_share_before_sign#share. The Petition stated that survivors had "been re-victimized by a system that strives for surface compliance, but that in practice, contributes to their trauma and the tolerance of sexual violence." *Id.*

337. The Petition called for the University to, among other things: (a) address the "victimization and severe injustice" of Gambill; (b) implement training in compliance with "federal law and the expectations of Title IX, The Dear Colleague Letters of 2010 and 2011 and the Clery Act"; (c) investigate the University's compliance with Title IX, Title VII, Title VI, and Title II, as well as reporting and procedures related to sexual misconduct; (d) expedite reviews of UNC officials including Dean Sauls; (e) implement "stronger disciplinary

78

punishment for perpetrators found guilty of sexual misconduct and sexual harassment"; and (f) improve the University alert system. *Id.*

338. Ultimately, the Petition garnered over 4,400 signatures. *Id.*

339. Students at UNC also held a rally in February of 2013 to demand prompt action and change in the University's handling of sexual misconduct complaints and in support of Gambill. *UNC-CH students rally against sexual assaults*, WRAL.COM, https://www.wral.com/rally-planned-at-unc-ch-on-sexual-assault-issues/12166672/ (published Feb. 28, 2013, 8:24 pm; last updated Mar. 1, 2013, 6:20 pm).

> ii. *After Public Scrutiny and the Filing of Formal Complaints, the DOE's OCR Launches an Investigation into UNC's Handling of Sexual Assault and Harassment Complaints.*

340. As a result of the student complaints, the DOE's OCR launched an investigation into such practices in March of 2013 that attracted widespread publicity and attention. Richard Pérez-Peña, *Students Initiate Inquiry Into Harassment Reports*, THE NEW YORK TIMES (Mar. 7, 2013), https://www.nytimes.com/2013/03/08/education/students-initiate-inquiry-into-harassment-reports.html?hpw; *Feds Will Probe Handling of Sexual Misconduct Case,* CAROLINA ALUMNI REVIEW (Mar. 7, 2013), https://alumni.unc.edu/news/feds-will-probe-handling-of-sexual-misconduct-case/; *Dept. of Ed Opens Investigation Into UNC's Handling of Sexual Assaults*,

HOSPITAL/SCHOOL/UNIVERSITY CAMPUS SAFETY (Mar. 14, 2013), https://www.campussafetymagazine.com/news/dept-of-ed-opens-investigation-into-unc-s-handling-of-sexual-assaults/; *Feds to investigate UNC's handling of sex assault cases*, WRAL.com, https://www.wral.com/feds-to-investigate-unc-s-handling-of-sex-assault-cases/12191041/ (published Mar. 6, 2013, 5:55 pm, last updated 11:28 pm).

341. UNC's then-chancellor Holden Thorp promised full cooperation with the federal investigation and highlighted the "commitment" of UNC to "help survivors of sexual assault get the information and resources they need." *Dept. of Ed Opens Investigation Into UNC's Handling of Sexual Assaults*, HOSPITAL/SCHOOL/UNIVERSITY CAMPUS SAFETY (Mar. 14, 2013), https://www.campussafetymagazine.com/news/dept-of-ed-opens-investigation-into-unc-s-handling-of-sexual-assaults/.

### iii. UNC Faces Even More Scrutiny, Including Becoming the Subject of a Documentary, While the OCR's Investigation Continues.

342. While the Office for Civil Rights' investigation of UNC remained underway, some UNC complainants connected with complainants at other universities across the country, including Occidental College, Amherst College, and Yale University, in an effort to start a nation-wide movement. Richard Pérez-Peña, *College Groups Connect to Fight Sexual Assault*, THE NEW YORK TIMES

(Mar. 19, 2013), https://www.nytimes.com/2013/03/20/education/activists-at-colleges-network-to-fight-sexual-assault.html.

343.   Two of the UNC complainants, Annie Clark and Andrea Pino, continued to attract national attention by speaking out against the mishandlings of their complaints both at UNC and at other institutions around the country. Rebecca Johnson, *Campus Sexual Assault: Annie E. Clark and Andrea Pino Are Fighting Back—And Shaping the National Debate*, VOGUE (Oct. 9, 2014), https://www.vogue.com/article/college-sexual-assault-harassment-annie-e-clark-andrea-pino.

344.   The stories of the various complainants "galvanized a community of UNC sexual-assault survivors who contend that the university isn't taking its students' allegations of sexual abuse seriously" highlighting that it's "about [them] collectively as survivors."  Strochlic, *supra* ¶ 2.

345.   In 2015, film directors Kirby Dick and Amy Ziering released a documentary titled *The Hunting Ground*, described as "an expose of rape crimes on U.S. college campuses, their institutional cover-ups, and the devastating toll they take on students and their families."  *The Hunting Ground*, INTERNET MOVIE DATA BASE, https://www.imdb.com/title/tt4185572/ (last visited Aug. 30, 2022).

346.   *The Hunting Ground* focused on the stories of two of the UNC complainants, Andrea Pino and Annie Clark, calling into focus once again UNC's

mishandlings of sexual misconduct complaints and further highlighting what some referred to as a "national epidemic." Leora Yashari, *The Stars of the Documentary* The Hunting Ground *Are Still Telling Sexual Assault Survivors, "We Believe You"*, VANITY FAIR (Jan. 8, 2016) https://www.vanityfair.com/hollywood/2016/01/the-hunting-ground-annie-clark-andrea-pino.

347. *The Hunting Ground* received critical acclaim despite several sources, including Harvard University Law School professors, calling into question the veracity of the statistics supporting the documentary. Ashe Schow, *19 Harvard Law professors pen letter denouncing 'The Hunting Ground'*, THE WASHINGTON EXAMINER (Nov. 11, 2015, 2:47 p.m.) https://www.washingtonexaminer.com/tag/cnn?source=%2F19-harvard-law-professors-pen-letter-denouncing-the-hunting-ground%2Farticle%2F2576140; Emily Yoffe, *How* The Hunting Ground *Blurs the Truth*, SLATE (June 1, 2015, 11:07 am), https://slate.com/news-and-politics/2015/06/the-hunting-ground-a-closer-look-at-the-influential-dcumentary-reveals-the-filmmakers-put-advocacy-ahead-of-accuracy.html;*The Hunting Ground* Film, https://www.thehuntinggroundfilm.com/ (last visited Aug. 30, 2022).

348. In 2016, yet another student spoke out publicly against UNC regarding the improper handling of her sexual misconduct complaint. UNC student Delaney Robinson held a press conference in September of 2016, during

82

which she told reporters that she was assaulted in February of 2016 and when she reported the matter to the University, she was "met with inaction and indifference." Tony Marco and Chandrika Narayan, *UNC student says she was raped by football player*, CNN (Sept. 14, 2016, 7:00 am) https://www.cnn.com/2016/09/13/us/unc-rape-allegations

*Student's Sexual Assault Claim Turns Attention to UNC Policy,* CAROLINA ALUMNI REVIEW (Sept. 14, 2016), https://alumni.unc.edu/news/students-sexual-assault-claim-turns-attention-to-unc-policy/.

349. Robinson stated that the University's policies promised "a rigorous process conducted by well-trained investigators" but that such a process did not occur in her case. *Id.*

350. Later, on the very same day as Delaney's press conference, UNC indefinitely suspended the respondent from the UNC football team. *Id.*

351. In April 2017, UNC found that the respondent did not violate the school's sexual misconduct policy and dismissed an appeal from Robinson challenging the outcome. Olivia Messer, *Sexual Assault Case Against UNC Football Player Dismissed*, THE DAILY BEAST (June 29, 2017), https://www.thedailybeast.com/sexual-assault-case-against-unc-football-player-dismissed.

### iii. The DOE finds UNC Violated Federal Statutes.

352.   On February 7, 2017, the Department of Education issued a Program Review Report regarding the University of North Carolina at Chapel Hill's failure to comply with the requirements of the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), the higher Education Act fire safety requirements, and the Department's regulations.

353.   The DOE issued its findings in response to the Program Review on August 23, 2019, concluding that UNC had violated the Clery Act for several years, in nine (9) major areas, which included:   (a) "lack of administrative capability"; (b) "failure to property define the campus/Clery geography"; (c) "failure to issue timely warnings"; (d) "failure to properly compile and disclose crime statistics"; (e) "discrepancies between the crime statistics included in the ASR and the data submitted to the campus safety and security data analysis cutting tool"; (f) failure to collect campus crime information from all required sources; (g) failure to follow institutional policy in a case of an alleged sex offense; (h) failure to disclose accurate and complete disciplinary referral statistics – failure to retain records needed to substantiate Clery Act compliance; and (i) failure to include required information I the annual fire safety reports."  Letter from Julian Schmoke, Director, Clery Act, Compliance Division, DOE, to Kevin M. Guskiewicz, Interim Chancellor    UNC    (Aug.    23,    2019)    https://police.unc.edu/wp-

content/uploads/sites/255/2019/11/U.S.-Department-of-Education-Final-Program-Review-August-2019.pdf.

354. In making its findings, the DOE reviewed relevant materials dating back to 2009. Schomke, *supra* ¶ 31; Charlie McGee, 'Blistering': *UNC faces fines after federal safety, crime reporting violations,* THE DAILY TAR HEEL (Nov. 19, 2019) https://www.dailytarheel.com/article/2019/11/unc-clery-act-violation-findings-reveal-report-omissions-and-retaliations-from-the-university.

355. The "blistering" 2019 Determination provoked further media attention and publicity. Emily Tulloch and Amy Dickerson, *Title IX Lessons from DOE Report Finding Clery Act Violations at UNC,* FRANCZEK, P.C. (Dec. 5, 2019), https://www.titleixinsights.com/2019/12/title-ix-lessons-from-doe-report-finding-clery-act-violations-at-unc/; McGee, *supra* ¶ 32.

> ### iv. The DOE's Office of Civil Rights Finds That UNC Violated Title IX Due to Its Mishandling of Sexual Misconduct Complaints, Resulting in a Resolution Agreement.

356. On June 25, 2018, the DOE issued a letter (the "Letter of Findings") in response to the complaints filed by students of UNC in 2013. Letter from Letisha Morgan, Office for Civil Rights Team Leader, District of Colombia Office, to Dr. Carol L. Folt, Chancellor, UNC Chapel Hill (June 25, 2018), https://www.unc.edu/wp-content/uploads/2018/06/FINAL-R-LOF-UNC-Chapel-Hill-11132051-PDF-1.pdf.

85

357.   After an extensive investigation spanning several years, the DOE found that UNC had violated Title IX due to its mishandling of the complainant's sexual misconduct complaints. *Id.* at 1.

358.   The issuance of the findings, after a five-year long investigation, drew widespread attention and media coverage.  Associated Press, *Federal Civil Rights Investigation Finds UNC Chapel Hill Mishandled Sexual Assault Claims,* WFAE 90.7, CHARLOTTE'S NPR NEWS SOURCE (June 26, 2018),   https://www.wfae.org/local-news/2018-06-26/federal-civil-rights-investigation-finds-unc-chapel-hill-mishandled-sexual-assault-claims (highlighting that "of the 285 cases" reviewed by the DOE, "only 18 were formally investigation by UNC and only five were done so within the proper timeframe."); Jeremy Bauer-Wolf, *The 'Confusing' Case of UNC's Title IX Violations*, INSIDE HIGHER ED (June 27, 2018), https://www.insidehighered.com/news/2018/06/27/unc-found-have-violated-title-ix-multiyear-investigation; *Office of Civil Rights Cites UNC Failures in Handling Sexual Assault*, CAROLINA ALUMNI REVIEW (June 27, 2018),  https://alumni.unc.edu/news/office-of-civil-rights-cites-unc-failures-in-handling-sexual-assault/ (noting that "UNC was one of the starting points of what became a network of assault victims across the country who called out their schools on what they saw as often poorly focused, overworked and

poorly trained counselors, investigators, health care providers, police and adjudicators in uncoordinated patchworks of offices and agencies"); *Federal investigation finds UNC violated Title IX in handling of sexual violence complaints,* ABC, INC., WTVD-TV RALEIGH DURHAM (June 26, 2018), https://abc11.com/unc-university-of-north-carolina-chapel-hill-sexual-harassment/3656640/.

359. In its Letter of Findings, the DOE identified UNC's violations, including but not limited to, a failure to adopt prompt and equitable grievance procedures, lack of timely resolution of complaints, and a failure to provide a non-hostile environment. *Id.* at 7-13.

360. UNC agreed to resolve the open investigation on June 21, 2018, "[w]ithout admitting to any violation of law", through a Resolution Agreement with the DOE (the "Resolution Agreement"). *Id.* at 13, 16-20.

361. The Resolution Agreement required UNC, among other things, to review and revise its Title IX policies and grievance procedures, revise and implement training procedures, and provide periodic reports to the OCR.

### v. UNC Faces Scrutiny Yet Again When the Rowing Coach is Accused of Sexual Harassment.

362. In December 2019, UNC faced scrutiny yet again when students

brought forth allegations of Title IX violations, including emotional abuse and sexual harassment, against the women's rowing coach Sarah Hanley. Chapel Fowler and Brian Keyes, *UNC rowing head coach resigns amid Title IX investigation*, THE DAILY TAR HEEL (Dec. 2, 2019), https://www.dailytarheel.com/article/2019/12/unc-rowing-head-coach-sarah-haney-resigns-title-ix-investigation.

The allegations included "inappropriate touching and comments about athletes' appearance and sexuality." *Id.*

363. Ultimately, Hanley resigned from her position. Fowler, *supra* ¶ 40; *see also* Dakota Moyer, *Former UNC Rowing Coach Denies Role in Reported Title IX Investigation*, CHAPELBORO.COM (Dec. 3, 2019), https://chapelboro.com/news/unc/former-unc-rowing-coach-denies-role-in-reported-title-ix-investigation.

> ### vi. UNC Agrees to Pay the DOE $1,500,000 and Engage in a Complete Overhaul of Its Existing Organizational Structure and Applicable Policies to Settle Violations.

364. In resolution of the Letter of Findings, UNC entered into a settlement agreement (the "Settlement Agreement") with the DOE on June 24, 2020. Settlement Agreement, UNC at Chapel Hill, United States DOE, June 24, 2020, https://police.unc.edu/wp-

content/uploads/sites/255/2020/06/Settlement-Agreement-UNC-and-U.S.-Department-of-Education-Executed-06262020.pdf.

365.   UNC's Chancellor, Defendant Guskiewicz, announced the Settlement Agreement on June 30, 2020, highlighting that "[t]he University has made improvements and changes since the review began, but the shortcomings do not meet Carolina's standards for excellence."   Message from Chancellor Guskiewicz on a settlement agreement with the Department of Education, Chancellor of the Univ. of North Carolina at Chapel Hill (June 30, 2020), https://www.unc.edu/posts/2020/06/30/clery-settlement/?utm_campaign=063020+Message+from+Chancellor+Guskiewicz+on+a+settlement+agreement+with+the+Department+of+Education&utm_medium=bitly&utm_source=Twitter-KG;   *see also* Kevin Guskiewicz (@KevinGuskiewicz), TWITTER (June 30, 2020, 2:20 PM) https://twitter.com/KevinGuskiewicz/status/1278030582988132353?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1278030582988132353%7Ctwgr%5E%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fchapelboro.com%2Fnews%2Func%2Func-pays-1-5-million-to-settle-over-past-campus-safety-violations.

366.   The Settlement Agreement was widely publicized.  Brighton McConnell, *UNC Pays $1.5 Million to Settle Over Past Campus Safety Violations,*   CHAPELBORO.COM,   (June   30,   2020),

https://chapelboro.com/news/unc/unc-pays-1-5-million-to-settle-over-past-campus-safety-violations.

367.  The Settlement Agreement highlighted that the DOE "issued a Final Program Review Determination…stating that UNC had failed to comply with the requirements of…the Clery Act..." Settlement Agreement, UNC at Chapel Hill, United States DOE, June 24, 2020, https://police.unc.edu/wp-content/uploads/sites/255/2020/06/Settlement-Agreement-UNC-and-U.S.-Department-of-Education-Executed-06262020.pdf at 1.

368.  As part of the Settlement Agreement, UNC and the DOE agreed to "address additional appropriate enhancements…to identify further steps that UNC will undertake to ensure continued compliance in the future." *Id.* Importantly, UNC agreed to pay a fine of $1,500,000 to the Department of Education and implement a series of corrective actions, outlined at length in the Appendix to the Settlement Agreement.  *Id.* at 2-8.  There were several notable "corrective actions" included in the Agreement.  *Id.* at 4-8.  Specifically, UNC retained a consultant that "designed a Clery Act Program Support Plan" (the "Clery Consultant") for UNC. *Id.* at 4.  The Clery Consultant's role was to: (a) "provide training to executives and practitioners"; (b) "coordinate the conduct of a self-study"; (c) "conduct a data audit to assess the accuracy and completeness of the institution's crime statistics and compliance with the timely warning and

90

emergency notification provisions"; (d) assess the adequacy of existing campus safety and crime prevention policies, procedures, and programs"; and (e) "assist the institution to identify and notice Campus Security Authorities (CSAs) and identify and classify its Clery Geography." Settlement Agreement, UNC at Chapel Hill, United States DOE, June 24, 2020, https://police.unc.edu/wp-content/uploads/sites/255/2020/06/Settlement-Agreement-UNC-and-U.S.-Department-of-Education-Executed-06262020.pdf at 4.

369. Additionally, mere months prior to the initiation of the complaints against Plaintiff, UNC agreed to undertake a complete overhaul of its existing policies and structure, to change its "organizational structure and existing campus safety and crime practices, policies, procedures, training programs, and systems" and, "in consultation with" the DOE, "implement new policies, procedures, training programs, and systems, as needed, to address deficiencies and other areas of concern identified by the [DOE]." *Id.* (emphasis added).

370. The Settlement Agreement also set forth what UNC and the DOE referred to as "Post-Review Monitoring" to "ensure that adequate remedial measures are developed, fully implemented and sustained." Id. The DOE anticipated, but did not guarantee, that "all Post-Review Monitoring activities" would be complete in approximately three years, or by 2023, thus bringing the cases against Plaintiff within this monitoring period. Id.

371.   The Post-Review Monitoring included, but is not limited to: (a) the formation of a new Clery Compliance Committee ("CCC"); (b) assessment of "existing crisis intervention and/or behavioral threat assessment teams"; (c) implementation of training, reviewed by the DOE, including "specialized training for investigators and hearing officials" that "must include training on understanding the trauma typically experienced by victims of violent crime, especially sexual violence"; (d) continued communication regarding misconduct and reporting; (e) "a complete reassessment of procedures and protocols" for campus safety, required programs by the Violence Against Women Reauthorization Act of 2013, and other areas; (f) self-assessments to identify potential additional violations; and (g)  on-site assessments by the DOE. Settlement Agreement, UNC at Chapel Hill, United States DOE, June 24, 2020, https://police.unc.edu/wp-content/uploads/sites/255/2020/06/Settlement-Agreement-UNC-and-U.S.-Department-of-Education-Executed-06262020.pdf at 5-8.

> ### vii.   Under Pressure from the Settlement Agreement, UNC Continues to Make Changes in an Attempt to Win Good Favor with the DOE.

372.   The University continued to hire additional staff and resources in response to the DOE's investigation.  UNC Vice Chancellor for Human Resources and Equal Opportunity and Compliance Becci Menghini wrote:  "[w]e recognize

the lasting impact sexual misconduct has both on individual members of our campus and on our community as a whole. . . [a]fter reviewing the results of the 2019 AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct, Chancellor Guskiewicz announced his intention to further invest in prevention and to hire a Chief Prevention Strategy Officer to oversee University prevention efforts.'" Brighton McConnell, *UNC Updates Its Title IX Policy, Reflects New Federal Guidelines,* CHAPELBORO.COM, (Aug. 20, 2020), https://chapelboro.com/news/unc/unc-updates-its-title-ix-policy-reflects-new-federal-guidelines. Additionally, UNC, along with schools across the entirety of the United States, updated their policies to align with the new 2020 Federal Regulations, effective August 2020. Brighton McConnell, *UNC Updates Its Title IX Policy, Reflects New Federal Guidelines,* CHAPELBORO.COM, (Aug. 20, 2020), https://chapelboro.com/news/unc/unc-updates-its-title-ix-policy-reflects-new-federal-guidelines; Becci Menghini, *University adopts new Title IX Policy in compliance with new federal regulations*, UNC HUMAN RESOURCES AND EQUAL OPPORTUNITY AND COMPLIANCE, (Aug. 14, 2020), https://eoc.unc.edu/university-adopts-new-title-ix-policy-in-compliance-with-new-federal-regulations/.

373. The 2013 complaints that incited staunch activism and demand for changes to UNC's handling of sexual assault allegations drew renewed national attention during the 50th anniversary of Title IX. The New York Times published

an article on April 27, 2022 which addressed the Title IX complaints filed by Pino and Clark in 2013, and the national survivor advocacy organization End Rape on Campus, that Pino co-founded.  Alina Tugend, *Title IX at 50: How it Changed Congress, Campuses and Sports*, THE NEW YORK TIMES (Apr. 27, 2022) https://www.nytimes.com/2022/04/27/arts/design/new-york-historical-society-title-ix-50.html.

### c.  The Title IX Pleading Standard.

374.  Title IX of the Education Amendments of 1972 provides, in relevant part, that:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

375.  Title IX may be violated by a school's failure to remedy sexual harassment, and by a school's imposition of discipline where gender is a motivating factor in the decision.  In either case, the statute is enforceable through an implied private right of action.  *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

376.  Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant UNC and the UNC System.

377. Upon information and belief, UNC and the UNC System, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a).

378. The Second Circuit in *Yusuf v. Vassar College* articulated two theories under which a plaintiff could plead a Title IX violation – erroneous outcome and selective enforcement.

379. Under an "erroneous outcome" case, the claim is that the plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings. "Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf v. Vassar Coll.*, 35 F.3d at 715.

380. Under the "selective enforcement" theory, the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

381. While some circuits continue to analyze Title IX claims under the erroneous outcome and selective enforcement theories, the Fourth Circuit has adopted the Seventh Circuit's view that there is "no need to superimpose doctrinal

tests on the [Title IX statute.] *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019). More simply, "the standard for Title IX claims in this context" asks: "do 'the alleged facts, if true, raise a plausible inference that the university discriminated [against John Doe] 'on the basis of sex'?" *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854–55 (7th Cir. 2019) (quoting *Purdue Univ.*, 928 F.3d at 667–68); *Schwake v. Arizona Bd. Of Regents*, 967 F.3d at 947.

382. In so doing, the Fourth Circuit has noted however that it "find[s] no inherent problems with the erroneous outcome and selective enforcement theories identified in *Yusuf*. In fact, either theory, with sufficient facts, may suffice to state a plausible claim. We merely emphasize that the text of Title IX prohibits all discrimination on the basis of sex. " *Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021) (citing 20 U.S.C. § 1681(a)).

### d. *Gender Bias Exhibited Throughout the Investigations and Adjudications.*

**383.** UNC violated Title IX in the instant case because the University reached two erroneous findings – that Plaintiff was responsible for sexual misconduct and that Roe could not be charged for doing exactly what she (falsely) alleged Plaintiff did to her – and gender bias was a motivating factor in the wrongful findings.

96

**384.** Further, there was a particularized causal connection between the erroneous outcomes in Plaintiff's disciplinary proceedings and his sex, as described in detail throughout this complaint.

385. Upon information and belief, UNC's mishandling of the investigation and adjudication of the Title IX complaint against Plaintiff was informed by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of rescission of federal funds.

386. UNC applied its policies and procedures in a manner that discriminated against Plaintiff on the basis of his sex and led to erroneous outcome in both Roe's complaint against Plaintiff and in Plaintiff's complaint against Roe.

387. UNC and the UNC System also imposed unwarranted and unjustly severe sanctions on Plaintiff, in suspending him, and gender bias was a motivating factor.

388. Several of the University administrators involved in the investigation and adjudication of Roe's complaint against Plaintiff and Plaintiff's complaint against Roe acted in a discriminatory manner against him, as further described below.

### i. The EOC and EEAC.

389. From the initiation of the charges against Plaintiff, the EOC and EEAC conspired to perform the investigations against Plaintiff in a manner calculated to find Plaintiff responsible for some policy violation.

390. UNC, before investigating the source of the complaints or the veracity of the allegations, immediately suspended Plaintiff, based simply on the fact that four female students had filed complaints, notwithstanding that this was not an instance of four unconnected and random individuals, but rather a coordinated campaign of female students who were part of a common friend group. In fact, one of the women admitted that her actions in organizing the complaints against Plaintiff were intended to ostracize him from his friends and to have him excluded from his fraternity.

### iii. The Investigators.

391. Investigator Jeremy Enlow, with respect to Plaintiff's complaint against Roe, and Investigators Feeney and Froehling, with respect to Roe's complaint against Plaintiff, exhibited bias against Plaintiff throughout the investigation process, which contributed to the resultant erroneous findings reached by the Hearing and Appeals Officer in Roe's complaint against Plaintiff

and the University's failure to investigate and adjudicate Plaintiff's complaint against Roe.

392. First, the investigators questioned Plaintiff and Roe in completely different manner; they would ask Roe and her witnesses leading questions, in an effort to elicit certain testimony helpful to Roe's allegations, while they repeatedly asked Plaintiff the same question in different ways, in an effort to catch him in inconsistencies. These interview tactics were employed with the intent of obtaining evidence that would support their pre-determinations regarding Plaintiff and Roe's respective complaints, the veracity of their allegations and their credibility.

393. Second, the investigators devoted extraordinary efforts in an unsuccessful attempt to disprove the undeniable fact that Roe exposed Plaintiff to the transmission of a sexually transmitted infection – as evinced by the medical records. This effort included a bizarre attempt to elicit testimony from a physician with no expertise in the subject matter.

394. The Investigators made very different efforts to seek relevant evidence from Plaintiff and Roe. They asked Roe and her witnesses to share information they wished to share; while pressing Plaintiff and his attorney to produce evidence to support his claims (even after he submitted conclusive medical evidence in one instance).

99

395. This difference in treatment with respect to the collection of evidence from the parties further highlights the Investigator Defendants' bias against Plaintiff as the male accused and in favor of Roe as the female accuser. So too, was their treatment of the evidence, highlighting evidence that supported their predetermined conclusions while ignoring or withholding from Plaintiff evidence that would refute their predetermined conclusions.

396. All of the foregoing indicia of bias, when committed by the individuals who were tasked as EOC Investigators with collecting the available evidence, and fairly, objectively, and neutrally summarizing the factual information gathered, irrefutably adversely affected the Hearing Officer's decision-making process.

397. Consequently, Defendant Feeney, Froehling and Enlow's bias permeated every aspect of the investigation, through the adjudication by the Hearing and Appeals Officers, and decision-making, influencing every administrator involved in any capacity in the disciplinary proceedings involving Plaintiff.

### ii. The Hearing Officer.

398. The Hearing Officer evidenced a bias against Plaintiff through his conduct and decision-making in adjudicating Roe's allegations against Plaintiff, including his ultimate findings.

399. The Hearing Officer engaged in gender biased actions throughout the proceeding, in an effort to ensure a finding of responsibility was reached.

400. Furthermore, the Hearing Officer chose to find Plaintiff responsible against the clear weight of the evidence and despite the undisputed evidence that all of the sexual contact between Plaintiff and Roe was *expressly* consensual from inception to completion, that Roe never withdrew her consent, and the complete absence of evidence that Roe's consent was "coerced."

401. To reach is clearly erroneous finding, the Hearing Officer engaged in implausible and tortured reasoning. For example, the Hearing Officer inexplicably concluded that he chose to dismiss or ignore the litany of Roe's false statements and omissions of material facts throughout the proceedings to find that Roe was "more credible" than Plaintiff, despite the fact that he could point to no such false statements made by Plaintiff.

402. And that is not all. The Hearing Officer not only ignored and dismissed Roe's lies and omissions, he literally used them as a basis to find her credible. So, for example, after the hearing it was indisputable that Roe told numerous lies to hide the fact that she – not Plaintiff -- came to the sexual interaction with a sexually transmitted infection and to falsely accuse Plaintiff of having done so, knowing this was a lie. Inexplicably, Hearing Officer noted that, when the medical evidence made it obvious that Roe was lying about her STI

testing and who came to the encounter with an STI, Roe conceded that she had lied. The only available conclusion to reach on these facts is that Roe was not credible on the subject. Yet, the Hearing Officer concluded that Roe was not only credible but also more credible than Plaintiff because she admitted to a litany of lies about her sexual interactions with Plaintiff throughout the proceedings.

403.   The Hearing Officer, despite the credibility issues attendant to Roe's statements and testimony – including her knowingly making a false charge concerning the transmission of STIs and a false claim that she had prior test results that showed no STI—demonstrated the Hearing Officer's determination to find Plaintiff responsible no matter what Roe told the EOC Investigators or testified to at the hearing.

404.   This nonsensical reasoning can only be explained by the same gender bias against Plaintiff as the male accused that drove the investigators, the hearing officer and the appeals officer's decision-making and infected the investigation and proceedings.

405.   The Hearing Officer further exhibited bias against Plaintiff as the male accused when they issued findings in favor of Roe that were inconsistent with, and directly contradicted by, the evidence. *See Doe v. Columbia* (831 F.3d 46, 57 (2d Cir. 2016) ("[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the

other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias.")

406. There was voluminous undisputed evidence of the accuser's propensity to lie before the Hearing Officer.

407. Finally, and most importantly, the Hearing Officer ignored the undisputed evidence that Roe consented to the sexual contact she had with Plaintiff at its inception and that Roe did not withdraw her consent at any point, and that Roe could point to no conduct on Plaintiff's part that amounted to "coercion" or anything resembling it.

408. Further, as discussed above, the public pressure on UNC to vindicate female survivors alleging sexual misconduct caused the University to subject Plaintiff to a biased and unfair investigation and adjudication that was tilted in favor of the female complainant and against him, the male.

409. It is well established that a university that is motivated to take adverse action against an accused male in order to respond to or protect itself from negative publicity about sexual harassment is motivated by gender bias and engages in unlawful sex discrimination under Title IX. *Doe v. Columbia Univ.*, 831 F.3d at 58 (stating that "fear of negative publicity or of Title IX liability[] are not necessarily . . . lawful motivations distinct from sex bias," and that an institution "that adopts,

103

even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute . . . in order to avoid . . . bad publicity[] has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex").

410.   Upon information and belief, UNC has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed upon male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female/non-male students.

411.   Based on the foregoing, and in furtherance of the conspiracy, Plaintiff was subjected to several biased, prejudiced, and unfair processes in violation of Title IX designed to find him, the male, responsible.

412.   This unlawful discrimination in violation of Title IX has proximately caused Plaintiff to sustain substantial and ongoing injury, damage, and loss, including, but not limited to:  emotional distress; psychological damages; loss of education; loss of future educational and career opportunities; reputational damages; economic injuries; and other direct and consequential damages.

413.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial but in excess of $75,000, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UNC to:  (i) permit Plaintiff to continue his enrollment as a student

in good standing at UNC until the conclusion of all proceedings on this complaint and then permanently thereafter; (ii) reverse the outcome, findings, and sanctions regarding Roe's complaints; (iii) expunge all records of the investigation, adjudication and disciplinary action against Plaintiff; (iv) remove any record of the findings and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; and (v) any and all further actions required to return Plaintiff to the *status quo ante*.

## COUNT III:  Breach of Contract (Against UNC)

414.   Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

415.   At all times relevant hereto, a contractual relationship existed between UNC and Plaintiff by virtue of Plaintiff's enrollment at UNC and as defined by and through UNC's policies and procedures governing the student disciplinary system, including but not limited to the Policy on Prohibited Sexual Harassment Under Title IX, the Policy on Prohibited Discrimination, Harassment and Related Misconduct Including Sexual and Gender-Based Harassment, Sexual Violence, Interpersonal Violence, and Stalking, and the Minimum Substantive and Procedural Standards for Student Disciplinary Procedures.

416. Through these policies, UNC provided specific, enforceable provisions outlining certain procedures that were to be followed by the institution before Plaintiff could be suspended or expelled for violation of a university policy.

417. Any failure to follow promised procedures in the disciplinary process would therefore constitute a violation of the University's contract with its student.

418. Additionally, Plaintiff entered into a signed written contract with the Thurgood Marshall College Fund, establishing a contractual relationship between Plaintiff and TMCF, which was dependent upon his continued enrollment at the University and of which the University is a third-party beneficiary.

419. Accordingly, through the documents it publishes and provides to students, UNC makes express and implied contractual commitments to students involved in the disciplinary process and/or the investigation of potential violations of the policies.

420. Under North Carolina law, the elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract.

421. Based on the aforementioned facts and circumstances, UNC created express and implied contracts when it offered, and Plaintiff accepted, admission to UNC, and when Plaintiff paid the required tuition and fees.

422.    UNC committed several breaches of its agreements with Plaintiff during the investigation and adjudication of Roe's complaint against Plaintiff.

### a.  *Failure to conduct a thorough and impartial investigation and adjudication process.*

423.    Through the applicable policies, UNC is required to:  (i) conduct "a prompt, thorough, and impartial investigation, designed to provide a fair and reliable gathering of the facts by a trained and impartial investigator"; (ii) the University committed to conducting a prompt, thorough, and impartial resolution process; (iii) both the Title IX Policy and the PPDHRM assure that the University will "provide for the prompt and equitable" response to reports; and (iv) the University affirmed that the Title IX Coordinator, investigator(s), and any individuals designated by the University as a decision-maker in the formal resolution process, must not have a conflict of interest or bias for or against Reporting Parties or Responding Parties generally or an individual Reporting Party or Responding Party; must not rely on sex stereotypes; and must promote impartial investigations and adjudications of Formal Complaints of Sexual Harassment.

424.    Each of the foregoing assurances were violated at every step of the process.  By way of example and not limitation:

- The Investigators' failure to investigate:

107

o Roe's statement to hospital personnel that she consented to sex, was not raped and declined a rape exam, in contradiction to statements to third parties that Plaintiff raped her;

o Roe's claim that, prior to the start of school, she had been examined and tested negative for the STI that she alleged Plaintiff transmitted to her, even after Plaintiff's antibody testing evidenced that he never had that or any STI;

o Roe lying to medical staff to obtain a second prescription for antibiotics and enticing Plaintiff to ingest the medication after accusing Plaintiff of giving her the STI and telling third-parties that Plaintiff infected her;

o Roe obtaining a contraceptive after stating she had not taken her birth control pill prior to sex with Plaintiff, then telling Plaintiff that she may be pregnant, and Plaintiff making an appointment with Planned Parenthood; and

o Roe going with Plaintiff to the same outdoor field where the sexual intercourse occurred a week later to play music and dance, and refusing to leave the field and rebuffing a friend who Roe previously told Plaintiff had raped her;

• The Investigators' demonstrated bias against Plaintiff:

108

o Asking Roe during her investigative interview if she got the results of a "rape kit" that Roe had declined when she went to the hospital and, when Roe attempted to answer, the Investigator told Roe they could talk about it off of the record - although notes of the off-record conversation were never submitted into evidence;

o Refusal to interview witnesses, such as Roe's roommate, among others, who interacted with Roe immediately after engaging in sex with Plaintiff.

o Failure to obtain all of Roe's relevant medical records;

o After receiving Roe's medical records on June 22, 2023 that referenced Roe's medical condition regarding bipolar disorder and hypersexuality that possibly affected her behavior and was relevant to Plaintiff's defense, on August 22, 2023 the Investigators deemed the records no longer relevant;

o Failure to gather evidence of the aforementioned violations for the investigative process;

- The Hearing Officer's demonstrated bias or arbitrariness:

o Finding Roe was more credible than Plaintiff despite undisputed evidence that Roe lied several times, while not finding that Plaintiff lied in his testimony;

o Not allowing Plaintiff's counsel to cross-exam Roe regarding her medical history even though her history was included in the medical records Roe provided;

o Making factually-unsupported arbitrary assumptions to justify acceptance of Roe's false statements and to find that Plaintiff was not credible; and

o Failing to consider or acknowledge that Roe's physical actions, rather than a lack of verbal consent, could signify her consent to sex.

### b. Failure to presume Plaintiff not responsible.

425. Defendants also violated their conduct policies when they failed to presume Plaintiff not responsible for the reported conduct at all times during the process, until a predetermined finding of responsibility was made and affirmed.

426. Plaintiff filed a complaint against Roe on April 17, 2023, for, among other things, knowingly or recklessly exposing him to an STI, falsely accusing him of transmitting an STI to Roe, falsely obtaining a prescription for antibiotics and enticing him to take said prescription, obtaining $60.00 from Plaintiff under false pretenses attributable to an STI and a pregnancy.

110

427.   After being interviewed by Defendant Investigator Enlow on or about May 8, 2023, Defendant Hall summarily dismissed Plaintiff's complaint on or about June 16, 2023. Upon information and belief, Plaintiff was the only person interviewed by Defendant Investigator Enlow.

428.   Plaintiff received the Report of the comprehensive testing that showed that his blood did not have antibodies evidencing any current or prior STI infection.

429.   On or about August 8, 2023, based on this new information, Plaintiff re-filed his complaint against Roe, this time supplemented with the evidence from the report and additional evidence supporting his allegations against Roe.

430.   On August 19, 2023, Defendant Hall summarily dismissed Plaintiff's re-filed complaint without investigation.

431. Defendant Hall likewise engaged in actions that revealed her predetermined conclusion that Plaintiff was responsible for the alleged misconduct.

432.   In connection with Plaintiff's complaint against Roe – for engaging in the exact conduct Plaintiff was charged – Hall responded to an inquiry concerning Plaintiff's complaint from Plaintiff's counsel in a manner that evidenced her abdication of the presumption that Plaintiff was not responsible for the violations Roe alleged.

433.   On August 15, 2023, before Defendant Hall dismissed Plaintiff's re-filed complaint against Roe, Plaintiff's counsel emailed Defendant Hall regarding the status of Plaintiff's re-filed complaint and supporting medical evidence.

434.   In an email dated August 19, 2023, Defendant Hall, among other things, not only summarily dismissed Plaintiff's re-filed complaint without investigation, but also made a veiled threat that Plaintiff's complaint could be construed as sanctionable "retaliation" as follows:

> . . . You are reminded, however, that the Policy prohibits retaliation and states, "Retaliation adverse action or attempted action that would discourage a reasonable person from engaging in protected activity. . . . Reports found to have been made frivolously or in bad faith may constitute retaliation and/or may be considered in the sanctioning process if an individual is otherwise found responsible for a violation of the Policy. . . . Any individual who engages in Retaliation or authorizes, instructs, or permits others to engage in retaliation on their behalf will be subject to prompt and appropriate disciplinary action." (Policy, § III.D.2)

435.   Defendant Hall made this threat (and subsequently disissed Plaintiff's complaint) notwithstanding her receipt of Plaintiff's Report of comprehensive STI testing showing that he did not have and could not have transmitted an STI to Roe. Upon information and belief, Hall engaged in this conduct to discourage Plaintiff and threaten to punish Plaintiff for pursuing his constitutional due process rights.

436. These actions further demonstrated the University's presumption of guilt against Plaintiff and bias in favor of Roe as both a female-accuser and as a female-accused, and the steps taken to ensure Plaintiff would ultimately be removed from the school while ensuring that Roe would not even be required to answer for her documented violation of the University's policy against sexual exploitation.

### c. Deprivation of Plaintiff's right to cross-examine his accusers.

437. The University's Title IX Policy guarantees a student accused of sexual misconduct the right to cross-examine the complaining witness, to use evidence to rebut evidence offered by the complaining witness and to use exculpatory and other evidence relevant to his defense.

438. The University violated this right repeatedly by, for example:

- Prohibiting Plaintiff from cross-examining Roe on the facts directly relevant to her credibility based on her multiple false statements of material fact throughout the proceedings, including, but not limited to, not being sexually active prior to engaging in sex with Plaintiff, not having or transmitting an STI to Plaintiff, or that it was Roe who exposed Plaintiff to an STI;

- prohibiting Plaintiff from cross-examining Roe regarding her medical records – that Roe provided to Plaintiff – regarding her medical conditions that had bearing on her claims against Plaintiff; and

- prohibiting Plaintiff from presenting evidence concerning responses to Roe's claim of sexual assault while permitting Roe to present evidence explaining her own incongruous conduct following the parties' sexual contact.

### d. Violation of the Implied Covenant of Good Faith and Fair Dealing

439. North Carolina courts recognize an implied covenant of good faith and fair dealing in every contract, which mandates that neither party will do anything which injures the right of the other to receive the benefits of the agreement.

440. In addition to the violations delineated above, UNC violated the covenant of good faith and fair dealing by failing to afford Plaintiff the fair, thorough, and impartial investigation processes to which he was entitled, resulting in the deprivation of the benefits of its educational contract with Plaintiff.

441. Each of the foregoing breaches contributed to a process that deprived Plaintiff of his fundamental and contractually guaranteed rights, directly and foreseeably resulting in the erroneous finding of responsibility, the severe sanction

of suspension for one-academic year, the loss of Plaintiff's scholarship and the other harms alleged herein.

442. As a further proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damage, economic injuries and other direct and consequential damages.

443. Therefore, Plaintiff is entitled to damages in excess of $75,000 in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT IV
### Negligent Training, Hiring, Supervision and Retention
### (Against UNC and Hall)

444. Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

445. At the time of the relevant events, Defendants UNC and Hall owed Plaintiff a duty to use care in the hiring, training, supervision, and retention of its personnel, including those employed by the EOC, including the investigators, the hearing officer and the appeal officer who were involved in the disciplinary investigations and adjudications of the cases against Plaintiff.

115

446.   In investigating the four matters against Plaintiff, Defendants Feeney, Froehling and Enlow, acted negligently when they conducted a procedurally defective and biased investigation process, designed to support his predetermined conclusion that Plaintiff was responsible for the alleged misconduct.

447.   Such negligence was exhibited by, for example:  (i) the investigators posing leading questions to the complainants and witnesses in an effort to elicit certain testimony and information, refusing to ask questions that would expose the complaining witness's deception, all while repeatedly asking Plaintiff the same question in different ways, in an effort to catch him in inconsistencies; (ii) their failure to pursue material evidence referenced by Roe and witnesses, such as contemporaneous communications and medical records, attributing this failure to his practice of allowing the reporting party and their witnesses to share whatever they are comfortable with; (iii) their inclusion of complaining witness's false accusation that Plaintiff exposed Roe to a sexually transmitted infection despite possessing proof that it was Roe that exposed Plaintiff to a sexually transmitted infection; (iv) withholding exculpatory evidence from Plaintiff and knowingly excluding it from the Final Investigation Report; (v) mischaracterizing the "evidence" to the Hearing Officer; and (vi) ignoring exculpatory evidence for Plaintiff known to them, failing to obtain exculpatory evidence they knew was

likely available but did not collect, and upon information and belief, withholding exculpatory evidence in their possession from Plaintiff.

448. Each of the foregoing demonstrated that Defendants Feeney, Froehling, and Enlow were incompetent in their duties and should not have been serving as a Title IX investigators for the University.

449. Defendant Hall, as Defendant Enlow's supervisor, had actual or constructive notice of her investigators acts and omissions described above, as she oversaw and was personally involved in the investigation processes.

450. Defendant Hall negligently supervised Defendants Feeney, Froehling and Enlow by failing to properly train them on how to conduct a fair and impartial investigation in compliance with the applicable University policies, and after learning of their deficiencies, failing to immediately retrain them and/or terminate their employment in that capacity despite her knowledge of the repeated demonstrations of incompetence and gender bias that pervaded their investigation.

451. Defendant Feeney, Froehling and Enlow's ineptitude in conducting the investigation proximately caused the harm Plaintiff suffered, namely suspension for one full academic year, the loss of his scholarship and liability for repayment of same, as the Hearing Officer foreseeably relied upon the Investigators' findings in reaching the final determinations of fact and in imposing the sanctions commensurate with the findings.

452. UNC exhibited further negligence in retaining Defendants Feeney, Froehling, and Enlow to serve as the investigators in this matter, given the public record of their lack of competence, fairness and impartiality documented in the *Doe v. UNC System, et al*. WDNC No.1:23-cv-00041, which formed the basis of a temporary restraining order and a preliminary injunction enjoining UNC and the same defendants from acting on the basis of the proceedings against the male plaintiff in that case.

453. As described by the plaintiff in *Doe,* Defendants Feeney, Froehling and Enlow engaged in virtually identical misconduct that violated the plaintiff's due process rights, and caused to judges of the Western District to issue injunctive relief against UNC

454. UNC's decision to retain investigators with a track record of depriving accused students of a fair proceeding, was both negligent and reckless.

455. Further, it was foreseeable that a negligently conducted disciplinary investigation would ultimately lead to incorrect findings, causing immense harm to the student found responsible and consequently sanctioned.

456. By participating, ratifying and condoning the aforementioned acts and omissions, Defendant Hall and UNC negligently breached their duty to use due care to avoid foreseeable harm to individuals such as Plaintiff, and that breach

directly and proximately caused Plaintiff to suffer the injuries and damages alleged herein.

457. As a direct and foreseeable consequence of Defendants' conduct, Plaintiff has suffered irreparable injury to his reputation, loss of educational opportunities, loss of future earning capacity, and other economic and non-economic losses.

### COUNT V: Negligent Infliction of Emotional Distress (Against the Individual Defendants)

458. Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

459. Defendants Hall, Feeney, Froehling, Enlow, Kasprzak, and Matthews each carried out their duties with respect to the cases against Plaintiff in a negligent manner when, either acting individually or in concert, they permitted the reporting parties to weaponize UNC's Title IX process against Plaintiff, engaged in decision-making calculated to lead to the predetermined conclusion that Plaintiff was responsible and must be punished severely, failed to ensure that the investigatory and adjudicatory processes were fair and objective, and instead contributed to the defective, prejudicial, and arbitrarily inequitable processes that were replete with gender bias against Plaintiff.

119

460.    By way of example and without limitation, Defendants:  (i) presumed Plaintiff responsible; (ii) conducted the investigation and adjudication of the accuser's false claims in a manner designed to ensure that Plaintiff was found responsible; (iii) when it became clear that the Roe's accusation that Plaintiff exposed her to a sexually transmitted infection, Defendants refused to dismiss the charge against Plaintiff; (iv) when Plaintiff filed a complaint and supporting medical evidence proving that it was Roe who recklessly exposed Plaintiff to a sexually transmitted infection, Defendants refused to charge Roe with the same violation they charged Plaintiff with on the same facts; (v) failed to request, obtain, and disclose to Plaintiff exculpatory evidence that he needed and could have used in his defense; (vi) prevented Plaintiff from using exculpatory evidence that Plaintiff did have – including evidence directly relevant to the accuser's credibility – in the hearing and appeal; (vii) included misleading information and demonstrably false claims made by the accuser without the proof of their falsity – in the investigation report to prejudice Plaintiff in the eyes of the Hearing Officer and the Appeal Officer before and during the hearing and appeal; (viii) conducted investigations skewed in favor of the complainant and designed to reach predetermined finding of responsibility; and (ix) deprived Plaintiff of the opportunity to cross-examine his accuser and to present evidence that directly contradicted his accuser's claims and impeached her credibility.

461.   In combination with conduct described above, the Defendants' actions evinced a malicious and corrupt intent and a pattern of extreme and outrageous behavior pursued with the intent to cause Plaintiff to suffer severe emotional distress.

462.   Plaintiff has in fact suffered severe emotional distress as a proximate result of Defendants' actions.

463.   It was reasonably foreseeable that such negligent acts would result in severe emotional distress to Plaintiff, given the nearly year-long process that forced him to continuously defend himself, attempt to prove his innocence, face administrators that were not unbiased but instead presumed him to be responsible from the beginning and, despite all of his efforts, ultimately resulted in him being permanently removed from school, ostracized from his friends and peers, removed from his prestigious scholarship, and suffering from irreparable harm to his reputation.

464.   Defendants' conduct will continue to cause harm to Plaintiff given the irreparable harm to his reputation, the interruption in his education, and the lifelong consequences that flow therefrom.

465.   It was reasonably foreseeable that Plaintiff would suffer emotional and psychological harm as a result of Defendants' conduct.

466. As a direct and foreseeable consequence of the foregoing conduct, Plaintiff has suffered, and will continue to suffer considerable emotional and psychological harm.

### COUNT VI: Intentional Infliction of Emotional Distress and Conspiracy (Against the Individual Defendants)

467. Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

468. Defendants Hall, Feeney, Froehling, Enlow, Kasprzak, and Matthews, individually and in concert, engaged in extreme and outrageous conduct when they permitted the complainant to weaponize UNC's Title IX process against Plaintiff, engaged in decision-making calculated to lead to the predetermined conclusion that Plaintiff was responsible and must be punished severely, failed to ensure that the investigatory and adjudicatory processes were fair and objective, refused to respond appropriately to evidence of Plaintiff's innocence, and instead contributed to the defective, prejudicial, and arbitrarily inequitable processes that were replete with gender bias against Plaintiff.

469. By way of example and without limitation, Defendants: (i) presumed Plaintiff responsible; (ii) conducted the investigation and adjudication of the accuser's false claims in a manner designed to ensure that Plaintiff was found responsible; (iii) when it became clear that the Roe's accusation that Plaintiff

122

exposed her to a sexually transmitted infection, Defendants refused to dismiss the charge against Plaintiff; (iv) when Plaintiff filed a complaint and supporting medical evidence proving that it was Roe who recklessly exposed Plaintiff to a sexually transmitted infection, Defendants refused to charge Roe with the same violation they charged Plaintiff with on the same facts; (v) failed to request, obtain, and disclose to Plaintiff exculpatory evidence that he needed and could have used in his defense; (vi) prevented Plaintiff from using exculpatory evidence that Plaintiff did have – including evidence directly relevant to the accuser's credibility – in the hearing and appeal; (vii) included misleading information and demonstrably false claims made by the accuser without the proof of their falsity – in the investigation report to prejudice Plaintiff in the eyes of the Hearing Officer and the Appeal Officer before and during the hearing and appeal; (viii) conducted investigations skewed in favor of the complainant and designed to reach predetermined finding of responsibility; and (ix) deprived Plaintiff of the opportunity to cross-examine his accuser and to present evidence that directly contradicted his accuser's claims and impeached her credibility.

470. The foregoing actions committed by the Individual Defendants as employees of the University, were so outrageous, so extreme in degree, and went beyond all bounds of decency, such that they were utterly intolerable.

471.   The actions of the Individual Defendants in their handling of the cases involving Plaintiff indicate either an intention to cause emotional distress to Plaintiff or a reckless indifference to the high likelihood that such actions would cause severe emotional distress to Plaintiff, and such conduct did cause Plaintiff to suffer severe emotional distress.

472.   Defendants' conduct will continue to cause harm to Plaintiff given the irreparable harm to his reputation, the interruption in his education, and the lifelong consequences that flow therefrom.

473.   As a direct and foreseeable consequence of the foregoing conduct, Plaintiff has suffered, and will continue to suffer considerable emotional and psychological harm.

### COUNT VII:  Tortious Interference with Contract
### (Against UNC and the Individual Defendants)

474.   Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

475.   The elements of tortious interference with contract under North Carolina law are:  (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant knows of the contract; (3) the defendant intentionally induces the third

person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff.

476.  As described above, Plaintiff entered into a valid contract with Thurgood Marshall College Fund, a third-party entity that is distinct and separate from the University itself.

477.  Defendant UNC was indisputably aware of the contract between Plaintiff and the Thurgood Marshall College Fund; his status as a Thurgood Marshall Scholar was discussed in the course of the disciplinary proceedings.

478.  If permitted to proceed, UNC's suspension of Plaintiff will trigger not only the immediate revocation of Plaintiff's scholarship but also will require Plaintiff to repay the Fund the amount of scholarship funds awarded, roughly $30,000.00.

479.  Specifically, the scholarship agreement provides in relevant part:

> Student agrees to forfeit and return or, as applicable, repay to TMCF the full amount of the Scholarship, at TMCF's discretion, within thirty (30) days if there is a change in Student's status (e.g., a leave of absence, a withdrawal, suspension, dismissal or other separation from Institution). Student's obligation of repayment shall apply to any and all Scholarship funds disbursed to the institution on Student's behalf during the semester in which the said change of status occurs.

480.   If permitted to treat its wrongful suspension of Plaintiff as final and operative, UNC will intentionally induce TMCF to cease carrying out the contract with Plaintiff.

481.   If permitted to treat its wrongful suspension of Plaintiff as final and operative, UNC and the Individual Defendants, intentionally, maliciously, and without justification, will induce the TMCF to cease performance of its contract with Plaintiff, revoke his scholarship, and demand that Plaintiff repay TMCF $30,000.00, the funds previously disbursed to Plaintiff, immediately.

482.   If permitted to treat its suspension of Plaintiff as final and operative, UNC and the Individual Defendants' conduct will inexorably result in actual damage to Plaintiff; namely, the revocation of his prestigious scholarship, an immediate obligation to pay TMCF the amount of funds TMCF disbursed to Plaintiff, reputational harm with those involved in TMCF's award of the scholarship to Plaintiff, a permanent record of Plaintiff's loss of the prestigious scholarship for misconduct that he did not commit, as well as all future opportunities that would arise from his connections to TMCF and his status as a Thurgood Marshall Scholar.

## COUNT VIII: Alternative Direct Claim for North Carolina Constitutional Violations (Against UNC)

483. Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

484. UNC is an agency of the State of North Carolina and the Individual Defendants are employees and agents of the State of North Carolina.

485. At all times relevant to this cause of action, UNC and its employees, agents, officers and directors were acting within the course and scope of the authority, employment or agency conferred on them by UNC and the State of North Carolina. As such, all of the conduct alleged herein is attributable to UNC and therefore to the State of North Carolina.

486. The foregoing acts, omissions, agreements, and individual and concerted conduct of Defendants directly and foreseeably caused the deprivations of the rights guaranteed to the Plaintiff by the North Carolina Constitution, including, but not limited to the following:

   a. Defendants' conduct deprived Plaintiff of the right to the fruits of his own labor in violation of Article I, Section 1;

   b. Defendants' conduct deprived Plaintiff of his constitutional right to education in violation of Article I, Section 15;

c. Defendants' conduct violated "the duty of the State to guard and maintain" Plaintiff's constitutional right to education in violation of Article I, Section 15;

d. Defendants' conduct denied Plaintiff the equal protection of the laws in violation of Article I, Section 19; and

e. Defendants' conduct violated Plaintiff's constitutional right not to be deprived of his liberties, privileges or property but by the law of the land, in violation of Article I, Section 19.

487. As a direct and foreseeable result of the foregoing violations of Plaintiff's rights under the North Carolina Constitution, Plaintiff has suffered the harms and damages alleged above in an amount to be determined by a jury and the imminent irreparable harms necessitating the injunctive relief Plaintiff seeks in this action.

488. Plaintiff pleads this direct cause of action under the North Carolina Constitution in the alternative to Plaintiff's state-law claims should those claims be barred in whole or part or otherwise fail to provide a complete and adequate state law remedy for the wrongs and harms Plaintiff suffered as a result of the unconstitutional conduct of the Defendants, their agents, and employees.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(a) On the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UNC to: (i) reverse the outcome, findings, and sanction arising out of the proceedings against Plaintiff; (ii) expunge Plaintiff's disciplinary record in its entirety; (iii) remove any record of investigation, charge, proceedings, findings or Plaintiff's suspension from UNC's records, including but not limited to Plaintiff's educational file/disciplinary records/transcript; (iv) any and all further actions necessary to return Plaintiff to the status quo ante;

(b) On the second cause of action for a violation of 42 U.S.C. § 1983 procedural due process, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UNC to: (i) reverse the outcome, findings, and sanction arising out of the proceedings against Plaintiff; (ii) expunge Plaintiff's disciplinary record in its entirety; (iii) remove any record of investigation, charge, proceedings, findings or Plaintiff's

129

suspension from UNC's records, including but not limited to Plaintiff's educational file/disciplinary records/transcript; (iv) any and all further actions necessary to return Plaintiff to the status quo ante;

(c) On the third cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of earning capacity, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(d) On the fourth cause of action for negligent hiring and retention, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of earning capacity, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(e) On the fifth cause of action for negligent infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological

damages, damages to reputation, past and future economic losses, loss of earning capacity, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(f)   On the sixth cause of action for intentional infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of earning capacity, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(g)  On the seventh cause of action for tortious interference with contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements; and

(h)  On the eighth cause of action for violations of the North Carolina Constitution, a judgment awarding Plaintiff damages

131

in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of earning capacity, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements; and

(i)     All such other and further relief the Court deems just and proper.

## JURY TRIAL DEMAND

489.   Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Respectfully submitted this 14th day of January 2024, by:

**EKSTRAND AND EKSTRAND, LLP**
*Attorneys for Plaintiff*

**By:** /s/   Robert Ekstrand
Robert C. Ekstrand, N.C. Bar No. 26673
110 Swift Avenue, 2nd Floor
Durham, North Carolina 27705
Office: (919) 416-4590
Cell. (919) 452-4647
rce@ninthstreetlaw.com

132

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

--------------------------------------------------------X
JACOB DOE

                    Plaintiff,

     v.

THE UNIVERSITY OF NORTH CAROLINA
SYSTEM, *et al*.,

                    Defendants.
--------------------------------------------------------X


## **VERIFICATION**

JACOB DOE, being duly sworn, deposes and says:

1. I am the Plaintiff in the above-captioned matter.

2. I have read the foregoing Verified Complaint, know the contents thereof, and affirm that the factual allegations contained therein are true to my own personal knowledge, except matters alleged upon information and belief and as to those matters, I believe them to be true.

Signed under the pains and penalties of perjury, on this 17th day of January 2023.

*Jacob Doe*
_____
Plaintiff Jacob Doe