## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

-------------------------------------------------------X

**JACOB DOE**

                       **Plaintiff,**

**v.**

                                              **No. 1:24-CV-41**

**THE UNIVERSITY OF NORTH
CAROLINA SYSTEM, et al.**

                       **Defendants.**

-------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR
## A TEMPORARY RESTRAINING ORDER AND
## <u>PRELIMINARY INJUNCTION</u>

1

## INTRODUCTION

In 2020, the North Carolina Supreme Court determined that under the state public records law, North Carolina's public universities must disclose to the press some disciplinary records relating to students found to have violated sexual assault policies. *DTH Media Corp. v Folt*, 841 S.E.2d 251 (N.C. 2020), *cert denied*, 141 S. Ct 1126 (2021). In a recent decision, the Western District of North Carolina addressed many of the issues raised in this motion and enjoined UNC from making the disclosure otherwise required by *DTH* in a case presenting very similar facts and the identical procedural posture. Preliminary Injunction, *Doe v. UNC et al*., No. 5:23-cv-00041, ECF No. 64 (W.D.N.C November 28, 2023) (annexed hereto as <u>Attachment No. 1</u>).

Relevant to this motion, the court in *Doe* ruled that the *DTH* decision has no weight in a federal court's determination of whether UNC should be enjoined from disclosing records of sexual misconduct proceedings that were the subject of the same claims asserted in this action. *Id*. The court then granted the plaintiff's motion for a preliminary injunction barring UNC from disclosing the plaintiff's disciplinary record in response to a public records request lodged by The Daily Tarheel. *Id*. This court should do so here.[1]

Plaintiff, a male Sophomore student, was the subject of a targeted campaign by a female student to harm him through vicious false accusations of sexual misconduct and assault. The University of North Carolina at Chapel Hill ("UNC" or the "University"),

---

[1] The plaintiff in *Doe* did not seek to enjoin the University from imposing the sanction (i.e., expulsion) imposed on the plaintiff. Here, the Plaintiff does seek an order preserving the *status quo ante* by enjoining the University from imposing the suspension.

instead of investigating the source of the complaint or the veracity of the allegations, immediately suspended Plaintiff, and subjected him to faulty, biased and unfair investigations, hearings and appeals processes, in violation of federal and state law and the guidelines set by UNC's Policies on Title IX and on prohibited discrimination, harassment and related misconduct. The erroneous outcome that stemmed therefrom resulted in Plaintiff's suspension from the entire UNC System for "at least one academic year".

Plaintiff has filed a Verified Complaint, ECF No. 1, seeking reversal of UNC's findings and sanctions based in part on gender discrimination in violation of Title IX. As Plaintiff is likely to succeed on the merits of the case and his reputation, future education and employment will be irreparably harmed if disclosure of the outcome of UNC's flawed process comes to light as the result of a January 5, 2024, public records request filed by the *Daily Tar Heel*. As such, Plaintiff seeks a temporary restraining order and injunction, to stay the disclosure of his name and disciplinary records to the press and the public and to enjoin UNC from suspending Plaintiff or otherwise acting on the erroneous outcome of the proceedings against Plaintiff until a final determination is made in this action.

Simply put, if the disclosure and the suspension are allowed to proceed, even if this Court later reverses UNC's findings and sanctions, such a decision will not be able to undo the harm caused to Plaintiff by the public disclosure or the year-long suspension. Conversely, a delay in the disclosure of the disciplinary findings and the imposition of the suspension will cause no harm to UNC, its students, the media or the public at large.

## STATEMENT OF THE FACTS

The merits of this case and the irreparable harm that would result from a premature suspension and disclosure of Plaintiff's disciplinary records are supported by the materials submitted in support of Plaintiff's Pseudonym Motion [ECF Nos. 2-3] and Plaintiff's Verified Complaint [ECF No. 1], which establish that throughout the investigations, adjudications and appeals of the complaints against Plaintiff, Defendants failed to abide by the guidelines set by UNC's Policy and acted in violation of federal and state law. The administrative proceedings against Plaintiff arose out of a complaint filed by Jane Roe ("Roe"). Verified Compl. ¶¶ 149-205. Plaintiff and Roe essentially agree that, on August 24, 2022, early in their first semester at UNC, they were introduced by a mutual friend. *Id.* ¶ 149. *Id.* ¶ 149. One week later, on August 31, 2022 at 8:04 p.m., a childhood friend of Plaintiff who was also a freshman at UNC ("Friend 1"), invited Plaintiff to her dorm room in text message saying he should come to her room a visit with her, her roommate and Jane Roe. *Id.* ¶ 150. After flirting throughout the evening, they walked to Hooker Field at UNC near midnight and, while lying in the grass with Roe on top of Plaintiff, began to kiss and fondle each other. *Id.* ¶ 151-157. Prior to engaging in sex, Roe said she was uncomfortable because "someone might see them" outdoors. *Id.* Both stopped kissing and fondling stopped and started talking. *Id.* ¶ 156. Roe was assured that no one would see them and the two resumed the sexual contact, with Roe on top of Plaintiff's lap, straddling him. *Id.* ¶¶ 156-158. Plaintiff asked Roe if she was on birth control, which Roe stated she was. *Id.* ¶ 159. Plaintiff asked Roe if she had any sexually

4

transmitted infections; Roe said she did not. *Id.* ¶ 160. Afterwards, while still outdoors on the field and Roe still sitting on top of Plaintiff, Plaintiff asked Roe, "do you want me?" and Roe nodded "yes." *Id.* ¶ 161-162. Plaintiff slid Roe's underwear to the side and the two had sexual intercourse. *Id.* ¶ 163. Roe did not protest or attempt to get up from on top of Plaintiff prior to or during sex and acknowledged that Plaintiff did not hold her down on top of him against her will. *Id.* ¶ 164.

Afterwards, Plaintiff and Roe walked back to their dorm, sat outside of the dorm on a bench and continued talking. During their conversation, Roe told Plaintiff that she enjoyed their sexual encounter, expressed excitement about continuing their relationship, and then said she hoped Plaintiff would not "leave [her] because everyone leaves [her]." *Id.* ¶ 165. Plaintiff told Roe that he did not yet share her interest in pursuing a relationship with Roe but that he hoped they would be friends. *Id.* ¶ 166. Roe was visibly upset by this response, and told Plaintiff that she sometimes "act[s] crazy" which she attributed to "a tumor in [her] brain." Plaintiff expressed his sympathy but did not inquire further. Id. ¶ 167. After roughly 20 minutes talking on the bench Plaintiff excused himself to get ready for an early class the next day. *Id.* ¶ 168. Plaintiff went to his room alone, arriving there at round 2:00 a.m. *Id.*

As Plaintiff was returning home to sleep, Roe sent a test message to Friend 1 stating, "I fucked up." *Id.* ¶ 169. Friend 1 replied asking Roe what she was referring to, but Roe did not elaborate or explain what she meant. Roe's medical

5

records at UNC Hospital show that she went there on three separate occasions after having sex with Plaintiff. *Id*. ¶ 169-198. The first time, in the early morning on September 1, 2022, Roe went to the emergency room and stated that she had had sex wanted to get tested for STIs. *Id*. ¶ 172-175. When asked if she had been sexually assaulted, Roe said "no," but she "felt pressured, and gave in" and "has regret." *Id*. ¶ 175. Roe explicitly declined a sexual assault examination. *Id*.

On September 2, 2023, Roe received a call from UNC Hospital stating that she had tested positive for an STI. Roe then returned to the hospital a second time to obtain antibiotic medication to treat her STI and to obtain a contraception after claiming she had not taken her birth control pill. *Id*. ¶ 177-190. After receiving the medication and informing Plaintiff of the STI diagnosis, and telling a third-party that Plaintiff had given her an STI, Roe informed Plaintiff that she would go back to UNC hospital and tell the medical staff she threw up one of her pills. That way, medical staff would give her a second prescription that she would give Plaintiff to treat the STI that Roe said Plaintiff had given to her and had Plaintiff believing he had contracted. *Id.* Roe's medical record states the above described-scenario almost verbatim as it recorded that Roe lied to obtain a second prescription during her third visit to the hospital, which she acknowledged she gave to Plaintiff. Believing that he had an STI, Plaintiff took the medication. *Id.*

In or about March 2023, Roe filed a formal complaint against Plaintiff alleging 1) sexual assault, 2) Plaintiff forced Roe to place her hand on Plaintiff's genitals, and 3) Plaintiff knowingly exposed Roe to an STI. *Id*. ¶¶ 206-207. In partial response to Roe's

complaint, in April 2023, Plaintiff underwent an STI panel in which his blood was examined for all STI antibodies. *Id*. ¶¶ 209-210. When exposed to an STI, the blood records the antibodies of the particular STI to which a person has been infected which essentially creates a history of prior STI infections. *Id*. The examination evidenced that Plaintiff had never previously been infected with any STI. *Id*. Thus, it was obvious that Roe had been infected with an STI by a person other than Plaintiff. *Id*.

Armed with this medical evidence, Plaintiff filed a complaint against Roe – alleging the same facts that gave rise to the EOC's charge of exposing Roe to an STI – the EOC not only refused to charge Roe with but refused to dismiss the charge against Plaintiff. *Id*. ¶¶ 211-212.

Following the above-referenced flawed investigation, failure to gather relevant evidence, and bias of the Hearing Officer, among other things, after a three day hearing on September 11, 13 and 19, 2023, Plaintiff was found responsible for sexual assault and forcing Roe to place her hand on Plaintiff's genitals. The Hearing Decision explicitly noted that ". . . it was unlikely that [Plaintiff] had ever had a[n STI] infection" and cleared Plaintiff of that charge. *Id*. ¶ 222. Plaintiff's appeal of the Hearing Decision was denied. Plaintiff has now exhausted his administrative remedies. *Id*.

Despite there being undisputed evidence of the accuser's express, voluntary consent throughout the sexual contact with Plaintiff, and notwithstanding the evidence showing that the accuser made several false statements of material fact to support her accusations against Plaintiff, Plaintiff was ultimately found responsible for non-consensual sexual contact in violation of the Title IX Policy. Consequently, he was suspended from the entire

7

University of North Carolina System for "at least one academic year." *Id.* ¶ 222. Plaintiff appealed the findings, conclusions and sanction of the Hearing Officer and his appeal was denied. *Id.* Plaintiff has exhausted the internal administrative procedures within the University and is seeking relief through this federal litigation. *Id.*

It is alleged in the Verified Complaint that throughout the investigation, adjudication and appeal of the allegations against Plaintiff, Defendants failed to abide by the guidelines set by UNC's Policy and acted in violation of federal and state law. A comprehensive factual summary supporting Plaintiff's request for relief is provided in the Verified Complaint. *Id.* ¶¶ 223-248. The Verified Complaint seeks relief for violations of Title IX of the Education Amendments of 1972, violation of Fourteenth Amendment Procedural Due Process, breach of contract, and other state law claim, including a direct cause of action for violations of the North Carolina Constitution. *Id.* ¶¶ 258-489

Plaintiff has been severely damaged by the Defendants' actions as his education and future have been severely compromised due to the biased, flawed and unjust procedures that resulted in Plaintiff's expulsion. *Id.* ¶¶ 249-257. Plaintiff has also suffered severe physical, psychological and emotional distress and irreversible harm to his reputation. *Id.* This motion seeks to prevent further irreparable harm to the Plaintiff through the premature disclosure of the flawed disciplinary findings and sanction.

## **QUESTION PRESENTED**

**Question**: Should this Court issue a temporary restraining order and preliminary injunction to prevent the disclosure of the findings of Plaintiff's disciplinary hearings, or any other information related thereto, until such time as a final determination is made in

this litigation?

**Answer**:  Yes.  It is likely that the findings of responsibility and sanction against Plaintiff, which derive from biased, flawed, and unjust processes conducted by the Defendants, will be reversed.  The premature disclosure of Plaintiff's name and the outcome of the biased and flawed hearings will cause irreparable harm and cannot be undone or remedied if this Court finds UNC to have violated Plaintiff's rights and reverses the administrative findings and sanction.  Conversely, a delay in the disclosure of such damning information until Plaintiff has had an opportunity to fairly litigate the findings and sanction poses no harm to the Defendants.  Notably, UNC opposed the disclosure of information from its disciplinary proceedings in the matter of *DTH Media Corp.*, 841 S.E.2d 251, 263, on the basis that such disclosure would, among other things, "jeopardize the safety of students found responsible during the Title IX process by placing them at risk for retribution."  That argument applies with equal force here.

## ARGUMENT

Plaintiff's motion for a temporary restraining order and preliminary injunction, which seeks to maintain the *status quo* and prevent irreparable harm during the pendency of this lawsuit, should be granted because the facts, as discussed herein, satisfy the requirements for such relief under the standard set forth in *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008), and as recognized by the Fourth Circuit in *Pashby v. Delia,* 709 F.3d 307, 320 (4th Cir. 2013).

Parties seeking a temporary restraining order and preliminary injunction must make a "clear showing" of four prerequisites: "(1) they are likely to succeed on the merits, (2)

9

they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." *Pashby v. Delia,* 709 F.3d at 320 (*citing Winter,* 555 U.S. at 20).[2]  The court must "separately consider each *Winter* factor to determine whether each factor has been "satisfied as articulated."  *Id.* at 320-321, (*citing The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2010), *reversed on other grounds*).  *See also Cantley v. W. Va. Reg'l Jail & Corr. Facility Auth.,* 771 F.3d 201, 207 (4th Cir. 2014); *AT by HT v. Univ. of N. Carolina,* No. 1:16-CV-489, 2016 WL 10586289, at *3 n.5 (M.D.N.C. July 7, 2016).

The North Carolina Supreme Court, in *DTH Media Corp.*, 841 S.E.2d 251, which is not binding or instructive to this Court, does not provide any guidance as to the timing by which disclosure of the final results of a disciplinary proceeding should occur.  While the burden to the movant seeking a TRO and Preliminary Injunction is high, given the silence in the law as to the timing of disclosure, the minimal effect that it would have on the public if the disclosure is delayed in comparison to the significant harm that will result to Plaintiff from premature disclosure, it is respectfully submitted that a stay of disclosure should be granted pending the outcome of this case.  Plaintiff is simply seeking to maintain the status quo by preventing the disclosure of his identity and the results of the disciplinary administrative proceedings until such time as this matter is decided before this Court

---

[2] "A request for a preliminary injunction is evaluated in accordance with a 'sliding scale' approach: the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp*., 952 F.2d 802, 813 (4th Cir. 1991), citing *Kowalski v. Chicago Tribune Co.,* 854 F.2d 168, 170 (7th Cir.1988).

because the irreparable harm from premature disclosure cannot be undone.

## I.    <u>Plaintiff is Likely to Succeed on the Merits of his Claims.</u>

To demonstrate a likelihood of success on the merits, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (internal quotations omitted). Motions for preliminary injunction are "governed by less strict rules of evidence." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016). Because "the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held" and "given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* (*quoting Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Here, it is claimed, in part, that UNC's decision to discipline Plaintiff was an erroneous outcome and was motivated by gender bias. "Title IX unquestionably prohibits federally supported educational institutions from practicing 'discrimination' on the basis of sex." *Brzonkala v. Va. Polytechnic Inst. and State Univ.*, 132 F.3d 949, 957 (4th Cir. 1997), *rev'd en banc on other grounds*, 169 F.3d 820 (4th Cir. 1999). The Fourth Circuit addressed the standard necessary to claim relief under Title IX in the context of a motion to dismiss in *Sheppard v. Visitors of Virginia State University*, 993 F.3d 230 (4th Cir. 2021), wherein it held that to state a claim for relief under Title IX, a plaintiff must allege facts that "raise a plausible inference that the university discriminated against [the student] on the basis of sex." The existence of substantial and particularized "procedural flaws" in

proceedings "affecting the proof" demonstrates a genuine issue of material fact as to whether there was discrimination on the basis of sex. *Id.* at 236 (discussing the "erroneous outcome" theory identified in *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994) and holding that such theory may suffice to state a claim with sufficient facts).

Pleading sufficient facts which cast some articulable doubt on the accuracy of the outcome of a Title IX disciplinary proceeding is "not a significant barrier to cross" and can be established in a number of ways including: pointing to procedural flaws in the investigatory and adjudicative processes; noting inconsistencies or errors in the adjudicator's oral or written findings; or challenging the overall sufficiency and reliability of the evidence. *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584 (E.D. Va. 2018); *Norris v. Univ. of Colo.*, 362 F. Supp. 3d 1001, 1011 (D. Colo. 2019); *Yusuf*, 35 F. 3d at 715. Allegations that a plaintiff was not provided a right of cross-examination when credibility was at stake is also sufficient to cast some articulable doubt on the accuracy of a disciplinary proceeding's outcome. *Baum*, 903 F.3d 575, 585-586 (6th Cir. 2018) (where the outcome of a university disciplinary proceeding depends on credibility, an accused has a constitutional due process right to "some form of cross-examination" of the accuser at an in-person hearing). As are "particular evidentiary weaknesses behind the finding of an offense such as motive to lie on the part of a complainant or witnesses." *Norris*, 362 F. Supp. 3d at 1011.

Gender bias can be inferred from the manner in which university officials treat a male Title IX respondent as compared to the female complainant(s), including allegations that exculpatory evidence was overlooked in favor of finding the male responsible for Title

IX violations. *Marymount U.*, 297 F. Supp. 3d at 586-587. *See Norris*, 362 F. Supp. 3d at 1012-1013.

In this case, the facts provided in the Verified Complaint sufficiently raise a plausible inference that UNC discriminated against Plaintiff when it found him responsible for violating UNC's Policy on Prohibited Sexual Harassment Under Title IX and UNC's Policy on Prohibited Discrimination, Harassment and Related Misconduct, resulting in a sanction of expulsion. UNC accepted the female students' accusations as true and operated under a presumption of guilt against Plaintiff, a male student, from the moment the complaints were filed. Examples of UNC's disparity in treatment throughout the proceedings include, but are not limited to:

- The withholding of information and evidence from Plaintiff throughout the proceedings.

- Reliance on demonstrably false allegations that Plaintiff "recklessly exposed [Roe] to a sexually transmitted infection" when, in fact it was Roe who exposed Plaintiff to a sexually transmitted infection ("STI") and maintaining the false charge against Plaintiff even after UNC had proof that it was Roe who exposed Plaintiff to an STI;

- When the medical evidence revealed Plaintiff did not have antibodies of any current or previous STI – which the Hearing Officer acknowledged in the hearing decision – and that it was Roe who recklessly exposed Plaintiff to an STI, the University refused to investigate or charge Roe with the violation and, inexplicably, maintained the same charge against Plaintiff.

- Prohibiting Plaintiff from cross-examining his accuser (Roe) on facts directly relevant to her credibility, despite clear evidence that she had made multiple false statements of material fact throughout the proceedings;

- Prohibiting Plaintiff from presenting evidence concerning responses to sexual assault while permitting the accuser to present evidence

13

explaining her own incongruous conduct following the parties' sexual contact.

- The Hearing Officer's reliance on non-existent evidence to support his finding that Plaintiff was responsible for a policy violation;

- The Hearing Officer's refusal to acknowledge that Roe did not dispute that she consented to the sexual intercourse and never withdrew her consent.

- The Hearing Officer's conclusion that Roe's consent was "coerced" despite the fact that there is no evidence in the record that Plaintiff engaged in any specific act or form of coercion, and Roe acknowledged that she was on top of Plaintiff and could have simply stood up but did not do so.

- The Investigators' refusal to investigate and gather evidence regarding Roe's false statements and behavior that , as required by Title IX, including but not limited to:

  1) Roe going to UNC Hospital after sexual intercourse with Plaintiff for a contraceptive after stating she had not taken her birth control pill prior to sex with Plaintiff, telling her treating medical professionals that she had not raped, that she "gave in" and consented to the intercourse with Plaintiff, that she merely "has regret" and declining a sexual assault exam;

  2) Roe lying to medical staff at UNC Medical Center to obtain a second prescription for the STI she exposed Plaintiff to, and enticing Plaintiff to ingest the medication *after* accusing Plaintiff of giving Roe an STI to third parties; and

  3) Roe returning to the outdoor field with Plaintiff where the sexual intercourse occurred approximately one (1) week after the sexual contact at issue where she played music and danced, and refusing to leave the field and rebuffing the friend who introduced Plaintiff to Roe when she saw Roe and Plaintiff together there and told Roe that it was not good for Roe to be there.

- The Investigators' bias against Plaintiff by asking Roe during her investigative interview if she got the results of a "rape kit" – even though Roe declined a rape examination when she went to UNC Hospital – and, when Roe attempted to answer, the Investigator cut Roe off and told Roe

they could talk about it off of the record, leaving the fact that Roe did not request or need a rape kit out of the record. The investigators did not include any memorialization of their off-record conversation with Roe in the investigative file.

- The Investigators' refusal to interview witnesses, such as Roe's roommate, who interacted with the accuser in the immediate aftermath of the alleged sexual assault because she would have reported Roe's inconsistent contemporaneous conduct and statements.

- The Investigators' refusal to submit to the Hearing Officer highly relevant evidence Plaintiff submitted, some of which conclusively refuted Roe's allegations;

- The Hearing Officer's bias in determining that Roe was more credible than Plaintiff despite undisputed evidence that Roe lied multiple times in the course of the proceedings about facts that were material and even dispositive of the violations she alleged. And at the same time, finding Plaintiff not credible unless a third party precisely corroborated the facts he reported.

Verified Compl. ¶¶ 383-412. The examples above only scratch the surface of the evidence of bias and policy violations committed by UNC in obtaining the wrongful finding of responsibility and sanction against Plaintiff.

A recent case, relying on the Fourth Circuit holding in *Sheppard*, opined that a university hearing panel's determination of responsibility based on biased assumptions and findings that a female's testimony is "more credible" than a male's testimony, raises an inference of gender bias. *Doe v. Washington & Lee University*, No. 6:19-cv-00023, 2021 WL 1520001, at *13 (W.D. Va. Apr. 17, 2021).

In the instant case, it is clear that UNC gave no credit to Plaintiff's testimony or evidence because he is a male and instead found against him despite a lack of evidence of any non-consensual sexual contact between Plaintiff and his accuser. In fact, the

15

undisputed evidence at the hearing showed that the complainant affirmatively consented to sexual intercourse with Doe and that she never withdrew her consent. UNC instead unfairly and arbitrarily determined responsibility based on unfounded conclusory accusations in the EOC's complaint, even after evidence establishing that the accuser's allegations were demonstrably false and, in one instance, the accuser's own medical records revealed that the accuser – not the Plaintiff – committed the violation the accuser alleged; namely recklessly exposing another to an STI. And when the University was confronted with that medical evidence, it not only refused to charge the accuser with recklessly exposing Plaintiff to an STI, just as it had charged Plaintiff on the same facts, but also refused to dismiss the charge against Plaintiff. It is difficult to imagine a more obvious instance of gender-based disparate treatment that to charge a male student recklessly exposing a female student to an STI and then, when the medical evidence reveals that it was the female student who recklessly exposed the male student to an STI, refusing to charge the female student with the same violation based on the irrefutable medical evidence and maintaining the medically impossible charge against the male student.

Moreover, the University's actions and decision-making in its handling of the complaints against Plaintiff were informed by ongoing external and internal pressures on UNC to aggressively pursue complaints of sexual misconduct against male students, further establishing a likelihood of success on his gender bias claim. In the Verified Complaint, Plaintiff details a series of events beginning in 2013, during which UNC became the subject of public and governmental scrutiny and criticism. These events include the public discussions initiated by current and former students regarding the

16

University's improper handling of their sexual assault complaints, investigations conducted by the Office for Civil Rights into whether UNC mishandled student sexual assault and harassment complaints, the release of a documentary which exposed the University's mishandling of assault claims, and the Department of Education's findings letter in response to OCR's investigation which concluded that UNC violated Title IX due its mishandling of sexual assault complaints. Verified Compl. ¶¶ 330-375 All of this culminated in the public imposition of a massive financial penalty on UNC. Id. ¶¶ 364-371

Each of the foregoing contributed to increased activism and negative media attention surrounding the University, which in turn, has created additional pressure on the University to aggressively pursue and punish male students accused of misconduct. *See Menaker v. Hofstra Univ.,* 935 F.3d 20, 33 (2d Cir. 2019) ("[W]hen combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even minimal evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination. . . . [W]here a university (1) takes an adverse action against a student or employee, (2) in response to allegations of sexual misconduct, (3) following a clearly irregular investigative or adjudicative process, (4) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, these circumstances provide the requisite support for a prima facie case of sex discrimination."); *see also Doe v. George Washington Univ.,* 366 F. Supp. 3d 1 (D.D.C. 2018) (Male university student sufficiently alleged causal connection between allegedly erroneous outcome in disciplinary proceedings against him for sexual assault and gender bias on part of university where university faced public pressure regarding its handling of

17

female students' sexual assault claims from federal investigations, public protests, and female students, including plaintiff's accuser, and that in response, university issued a statement as proof of its commitment to combatting sexual assault.)

Plaintiff has clearly alleged facts sufficient to establish gender bias under the standard set forth in *Sheppard*, 993 F.3d 230 and the "erroneous outcome" framework articulated in *Yusuf*, 35 F.3d 709. Accordingly, such facts surely demonstrate a likelihood of success on the merits sufficient to warrant the entry of a TRO and preliminary injunction against the disclosure of information concerning the disciplinary findings and sanction against Plaintiff to the public or the media pending the outcome of this case.

## II. Plaintiff will suffer Irreparable Harm if the University is Permitted to Treat its Decisions Below as Final and if Plaintiff's Name and the Results of his Disciplinary Proceeding are Prematurely Disclosed.

The substantial harm suffered by Plaintiff as a result of the biased proceedings, resulting in findings of sexual misconduct and a sanction of a suspension for a full academic year is devastating, and without immediate intervention, the suspension together with the publication of any information concerning the findings and sanction of the biased and flawed proceedings will unquestionably cause extreme irreparable harm to Plaintiff's reputation, education and employment opportunities.

It is well established that a showing of irreparable harm requires a Plaintiff to demonstrate that he is subject to a continuing harm that cannot be adequately addressed by final relief on the merits and for which "monetary damages are difficult to ascertain or are inadequate." *Lab'y Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 463 (M.D.N.C. 2015) (citing *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,

22 F. 3d 546, 551–52 (4th Cir. 1994)).

It is well understood that harm is irreparable when it cannot be cured by a monetary award. *See, Hughes Network Systems, Inc. v. InterDigital Communication Corp.*, 17 F.3d 691 (4th Cir. 1994). The premature disclosure of the disciplinary information against Plaintiff, associating him with violations of sexual misconduct or abuse, will be devastating and incurable. Assuming that this Court reverses the University's finding and Plaintiff is able to return to UNC, his safety at the school will be in jeopardy, he will be at risk for retribution, and his future career prospects will be severely limited by the falsely publicized misinformation. UNC itself acknowledged the very fact of irreparable harm that students would face with such disclosure in *DTH Media Corp.*, (841 S.E.2d 251, 263), recognizing that "[r]esponsible students who are named publicly may be subject to severe harassment and retribution . . . [s]ome of these students may face threats to their immediate physical safety. . . [o]thers may suffer lifelong stigma despite never having been found guilty in a formal court proceeding. *Kevin M. GUSKIEWICZ, in his official capacity as Chancellor of The University of North Carolina at Chapel Hill, et al., Petitioners, v. DTH MEDIA CORPORATION, et al., Respondents.*, 2020 WL 6162030 (U.S.) 21. Therefore, any information relating to the disciplinary proceedings, finding and sanction against Plaintiff must be withheld pending the outcome of this litigation, because the alternative is devastating and irreparable to Plaintiff.

Finally, this irreparable harm is imminent. The University has received a formal request for records that include the records of the disciplinary proceedings against Plaintiff. **Attachment No. 2** (public records request submitted January 5, 2024 by a representative

of The Daily Tarheel).  The Request demands:

> … access to and a copy of records containing the name of any student who has — between January 1, 2021 to the present date — been found responsible for sexual misconduct through UNC-Chapel Hill's disciplinary proceedings, the violation committed, and the sanction imposed.

*Id*. at 1. Therefore, in the absence of the court's intervention, the newspaper will obtain and publish Plaintiff's name, the finding of responsibility for sexual misconduct, and the suspension and other sanctions imposed. The harm from publishing these wrongful findings is irreparable and imminent.

### III.    The Balance of Hardships Tips Decidedly In Plaintiff's Favor.

In assessing this factor, a court must consider the burdens that would be imposed on the moving party and the non-moving party if the injunction were granted.  *See Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020).  Where granting an injunction would have little impact on the non-moving party, but denying the relief sought would cause great harm to the moving party, this factor weighs in favor of granting the injunction.  *See NovaQuest*, 498 F. Supp. 3d at 838; *Frankenmuth Mut. Ins. Co. v. Cadet Constr. Co.*, No. 1:19-CV-1125, 2020 WL 2322726, at *5 (M.D.N.C. May 11, 2020).

The balance of hardships in this case weighs decidedly in Plaintiff's favor.  UNC has never taken the position in prior cases that a stay of disclosure of disciplinary findings and sanctions against a student places a burden on UNC.  In fact, UNC has been a supporter of confidentiality of these proceedings for the safety of its students and the integrity of the administrative process.  Therefore, UNC cannot argue now that it would be impacted by a delay of disclosure pending the outcome of this litigation.

20

Conversely, as discussed in Section II, *supra*, the burden to Plaintiff if the TRO and preliminary injunction is denied is significant and will negatively harm him throughout his life, even if the findings and sanction are ultimately reversed. The requested injunction sought by the Plaintiff will temporarily restrict the disclosure of information until such time as this case is decided, after which disclosure will be determined by the outcome of this case.

**IV.**     **It is in the Public Interest to Grant the Injunction.**

It is always in the public interest to enforce and uphold constitutional rights. *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191(4th Cir. 2013); *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011). The "public interest is certainly served by promoting compliance with Title IX." *Doe* v. Wood County Bd. of Educ., 888 F. Supp.2d 771 (S.D.W.V. 2012). Antidiscrimination laws prohibiting sex discrimination serve "compelling state interests of the highest order." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984). Therefore, the public, as well as Plaintiff, have a shared interest in ensuring that Title IX rights are properly protected. Moreover, there is a public interest in ensuring the accuracy of the disclosures permitted by the holding in *DTH Media Corp. v Folt.*

In furtherance of protecting Plaintiff's constitutional rights against gender bias, it is crucial that the information concerning the biased and flawed disciplinary proceedings be enjoined from disclosure until such time as a final determination is made in this lawsuit.

**V.**     **A Bond is Unnecessary.**

Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount

21

that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d at 332. Plaintiff submits that no bond is required here as Defendants will not suffer any material damage, nor be exposed to the likelihood of any harm, if the requested preliminary injunction is granted. Therefore, Plaintiff submits that he should not be required to post any bond/security as part of this motion.

## CONCLUSION

For the reasons stated above, the Court should grant a temporary restraining order and preliminary injunction to prevent Defendants from taking adverse action based on the proceedings at issue in this action. This necessarily includes an order (i) prohibiting Defendants from suspending Plaintiff or otherwise interfering with Plaintiff's participation in courses in which is enrolled or will be enrolled, Plaintiff's access to the University's educational programs, facilities, and resources; and prohibiting Defendants from otherwise treating Plaintiff differently than a student in good-standing; (ii) prohibiting Defendants from releasing or disclosing any information concerning the disciplinary proceedings that are the subject of this lawsuit; (iii) requiring Defendants to direct all individuals, including but not limited to employees and students, over whom they exercise control to refrain from publishing or disclosing any information concerning Plaintiff, the disciplinary proceedings, or the outcomes of such proceedings; (iv) requiring UNC to inform any media outlet, or any other third party, that receives information concerning Plaintiff's disciplinary outcome about the filing of this motion for a temporary restraining order and preliminary injunction.

Respectfully submitted this 17th day of January 2024, by:

**EKSTRAND & EKSTRAND, LLP**
*Attorneys for Plaintiff*

**By:**    /s/  Robert Ekstrand
Robert C. Ekstrand, Esq.
N.C. Bar No. 26673
110 Swift Avenue, 2nd Floor
Durham, North Carolina 27705
Office: (919) 416-4590
Cell: (919) 452-4647
rce@ninthstreetlaw.com

## CERTIFICATE OF COMPLIANCE WITH LR7.3(d)

I hereby certify that the foregoing brief complies with the word-count requirements prescribed by LR7.3(d) in that the body of the brief contains no more than 6,250 words, exclusive of captions, signature lines, certificates, cover page or index, as reported by the word processing software used to create it.

Respectfully submitted this 17th day of January, 2024.

/s/   Robert C. Ekstrand
Robert C. Ekstrand


## CERTIFICATE OF SERVICE

I hereby certify that on 17 January 2024 I filed the foregoing using the Clerk's CM/ECF system, which will provide electronic notice to all counsel of record registered to receive NEFs in this matter; and, further, I certify that the foregoing will be served on all parties together with the summons and complaint. I also certify that a copy of this motion was delivered via electronic mail to the in-house litigation counsel for the University of North Carolina at Chapel Hill.

Respectfully submitted this 17th day of January, 2024.

/s/   Robert C. Ekstrand
Robert C. Ekstrand